Mr. Justice White
announced the judgment of the Court and delivered an opinion,
in which The Chief Justice and Mr. Justice Brennan join.
Like No. 48, United Mine Workers v. Pennington, decided today, ante, p. 657, this case presents questions regarding the application of §§ 1 and 2 of the Sherman Antitrust Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2 (1958 ed.), to activities of labor unions. In particular, it concerns the lawfulness of the following restriction on the operating hours of food store meat departments contained in a collective bargaining agreement executed after joint multi-employer, multi-union negotiations:
“Market operating hours shall be 9:00 a. m. to 6:00 p. m. Monday through Saturday, inclusive. No cus *694 tomer shall be served who comes into the market before or after the hours set forth above.”
This litigation arose out of the 1957 contract negotiations between the representatives of 9,000 Chicago retailers of fresh meat and the seven union petitioners, who are local affiliates of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL-CIO, representing virtually all butchers in the Chicago area. During the 1957 bargaining sessions the employer group presented several requests for union consent to a relaxation of the existing contract restriction on marketing hours for fresh meat, which forbade the sale of meat before 9 a. m. and after 6 p. m. in both service and self-service markets.[1] The unions rejected all such suggestions, and their own proposal retaining the marketing-hours restriction was ultimately accepted at the final bargaining session by all but two of the employers, National Tea Co. and Jewel Tea Co. (hereinafter “Jewel”). Associated Food Retailers of Greater Chicago, a trade association having about 1,000 individual and independent merchants as members and representing some 300 meat dealers in the negotiations, was among those who accepted. Jewel, however, asked the union negotiators to present to their membership, on behalf of it and National Tea, a counteroffer that included provision for Friday night operations. At the same time Jewel voiced its *695 belief, as it had midway through the negotiations, that any marketing-hours restriction was illegal. On the recommendation of the union negotiators, the Jewel offer was rejected by the union membership, and a strike was authorized. Under the duress of the strike vote, Jewel decided to sign the contract previously approved by the rest of the industry.
In July 1958 Jewel brought suit against the unions, certain of their officers, Associated, and Charles H. Bro-mann, Secretary-Treasurer of Associated, seeking invalidation under §§ 1 and 2 of the Sherman Act of the contract provision that prohibited night meat market operations. The gist of the complaint was that the defendants and others had conspired together to prevent the retail sale of fresh meat before 9 a. m. and after 6 p. m. As evidence of the conspiracy Jewel relied in part on the events during the 1957 contract negotiations — the acceptance by Associated of the market-hours restriction and the unions’ imposition of the restriction on Jewel through a strike threat. Jewel also alleged that it was a part of the conspiracy that the unions would neither permit their members to work at times other than the hours specified nor allow any grocery firm to sell meat, with or without employment of their members, outside those hours; that the members of Associated, which had joined only one of the 1957 employer proposals for extended marketing hours, had agreed among themselves to insist on the inclusion of the marketing-hours limitation in all collective bargaining agreements between the unions and any food store operator; that Associated, its members and officers had agreed with the other defendants that no firm was to be permitted to operate self-service meat markets between 6 p. m. and 9 p. m.; and that the unions, their officers and members had acted as the enforcing agent of the conspiracy.
*696 The complaint stated that in recent years the prepackaged, self-service system of marketing meat had come into vogue, that 174 of Jewel’s 196 stores were equipped to vend meat in this manner, and that a butcher need not be on duty in a self-service market at the time meat purchases were actually made. The prohibition of night meat marketing, it was alleged, unlawfully impeded Jewel in the use of its property and adversely affected the general public in that many persons find it inconvenient to shop during the day. An injunction, treble damages and attorneys’ fees were demanded.
The trial judge held the allegations of the complaint sufficient to withstand a motion to dismiss made on the grounds, inter alia, that (a) the alleged restraint was within the exclusive regulatory scope of the National Labor Relations Act and was therefore outside the jurisdiction of the Court and (b) the controversy was within the labor exemption to the antitrust laws. That ruling was sustained on appeal. Jewel Tea Co. v. Local Unions Nos. 189, etc., Amalgamated Meat Cutters, AFL-CIO, 274 F. 2d 217 (C. A. 7th Cir. 1960), cert. denied, 362 U. S. 936. After trial, however, the District Judge ruled the “record was devoid of any evidence to support a finding of conspiracy” between Associated and the unions to force the restrictive provision on Jewel. 215 F. Supp. 839, 845. Testing the unions’ action standing alone, the. trial court found that even in self-service markets removal of the limitation on marketing hours either would inaugurate longer hours and night work for the butchers or would result in butchers’ work being done by others unskilled in the trade. Thus, the court concluded, the unions had imposed the marketing-hours limitation to serve their own interests respecting conditions of employment, and such action was clearly within the labor exemption of the Sherman Act established by Hunt v. Crumboch, 325 U. S. 821 ; United States v. Hutcheson, 312 U. S. 219; United States *697 v. American Federation of Musicians, 318 U. S. 741. Alternatively, the District Court ruled that even if this was not the case, the arrangement did not amount to an unreasonable restraint of trade in violation of the Sherman Act.
The Court of Appeals reversed the dismissal of the complaint as to both the unions and Associated. Without disturbing the District Court’s finding that, apart from the contractual provision itself, there was no evidence of conspiracy, the Court of Appeals concluded that a conspiracy in restraint of trade had been shown. The court noted that “[t]he rest of the Industry agreed with the Defendant Local Unions to continue the ban on night operations,” while plaintiff resisted, and concluded that Associated and the unions “entered into a combination or agreement, which constituted a conspiracy, as charged in the complaint. . . [wjhether it be called an agreement, a contract or a conspiracy, is immaterial.” 331 F. 2d 547, 551.
Similarly, the Court of Appeals did not find it necessary to review the lower court’s finding that night marketing would affect either the butchers’ working hours or their jurisdiction, for the court held that an employer-union contract respecting working hours would be unlawful. “One of the proprietary functions is the determination of what days a week and what hours of the day the business will be open to supply its customers. ... As long as all rights of employees are recognized and duly observed by the employer, including the number of hours per day that any one shall be required to work, any agreement by a labor union, acting in concert with business competitors of the employer, designed to interfere with his operation of a retail business ... is a violation of the Sherman Act .... [T]he furnishing of a place and advantageous hours of employment for the butchers to *698 supply meat to customers are the prerogatives of the employer.” 331 F. 2d 547, 549.
We granted certiorari on the unions’ petition,[2] 379 U. S. 813,[3] and now reverse the Court of Appeals.
I.
We must first consider the unions’ attack on the appropriateness of the District Court’s exercise of jurisdiction, which is encompassed in their contention that this controversy is within the exclusive primary jurisdiction of the National Labor Relations Board. On this point, which is distinct from the unions’ argument that the operating-hours restriction is subject to regulation only by the Board and is thus wholly exempt from the antitrust laws, the unions’ thesis is that the pivotal issue is whether the operating-hours restriction is a “term or condition of employment” and that the District Court should have held the case on its docket pending a Board proceeding to resolve that issue, which is said to be peculiarly within the competence of the Board.
“The doctrine of primary jurisdiction ... applies where a claim is originally cognizable in the courts, and comes *699 into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.” United States v. Western Pac. R. Co., 352 U. S. 59, 63-64. The doctrine is based on the principle “that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over,” Far East Conference v. United States, 342 U. S. 570, 574, and “requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme,” United States v. Philadelphia Nat. Bank, 374 U. S. 321, 353.
Whether a proposed bargaining subject is a term or Condition of employment is an issue that the Board frequently determines in considering charges that an employer or union has violated the duty to bargain in good faith concerning “wages, hours, and other terms and conditions of employment,” the mandatory subjects of bargaining described in § 8 (d) of the National Labor Relations Act, 49 Stat. 452, as amended. Such an issue may be raised by an unfair labor practice charge of violation of § 8 (a)(5) or § 8 (b)(3) through, for example, a refusal to bargain on a mandatory subject of bargaining, see Labor Board v. Katz, 369 U. S. 736, or insistence on a nonmandatory subject, see Labor Board v. Borg-Warner Corp., 356 U. S. 342. Thus, the unions contend, Jewel could have filed an unfair labor practice charge with the Board on the ground that the unions had insisted on a nonmandatory subject — the marketing-hours restriction. Obviously, classification of bargaining subjects as “terms *700 or conditions of employment” is a matter concerning which the Board has special expertise. Nevertheless, for the reasons stated below we cannot conclude that this is a proper case for application of the doctrine of primary jurisdiction.
To begin with, courts are themselves not without experience in classifying bargaining subjects as terms or conditions of employment. Just such a determination must be frequently made when a court’s jurisdiction to issue an injunction affecting a labor dispute is challenged under the Norris-LaGuardia Act, which defines “labor dispute” as including “any controversy concerning terms or conditions of employment,” Norris-LaGuardia Act, § 13 (c), 47 Stat. 73, 29 U. S. C. § 113 (c) (1958 ed.). See Order of Railroad Telegraphers v. Chicago & N. W. R. Co., 362 U. S. 330; Bakery Drivers Union v. Wagshal, 333 U. S. 437; cf. Teamsters Union v. Oliver, 358 U. S. 283.
Secondly, the doctrine of primary jurisdiction is not a doctrine of futility; it does not require resort to “an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.” Maritime Board v. Isbrandtsen Co., 356 U. S. 481, 521 (Frankfurter, J., dissenting). It was only after commencement of trial that it became evident that a major issue in this case would be whether the marketing-hours restriction was a term or condition of employment. Jewel’s complaint alleged the existence of a conspiracy between Associated and the unions to impose the marketing-hours provision on Jewel — that is, it was alleged that the unions had agreed with a part of the bargaining unit to impose certain terms on the rest of the unit. We hold today in United Mine Workers v. Pennington with respect to allegations of a similar employer-union agreement to *701 impose a particular scale of wages — indisputably at the core of “wages, hours, and other terms and conditions of employment” — that such an understanding is not exempt from the Sherman Act. At the stage when the decision whether to refer the parties to the Board was made, therefore, the issues were so framed that a Board determination would have been of subsidiary importance at best.
Finally, we must reject the unions’ primary-jurisdiction contention because of the absence of an available procedure for obtaining a Board determination. The Board does not classify bargaining subjects in the abstract but only in connection with unfair labor practice charges of refusal to bargain. The typical antitrust suit, however, is brought by a stranger to the bargaining relationship, and the complaint is not that the parties have refused to bargain but, quite the contrary, that they have agreed. Jewel’s conspiracy allegation in the present case was just such a complaint. Agreement is of course not a refusal to bargain, and in such cases the Board affords no mechanism for obtaining a classification of the subject matter of the agreement. Moreover, even in the few instances when the antitrust action could be framed as a refusal to bargain charge, there is no guarantee of Board action. It is the function of the Board’s General Counsel rather than the Board or a private litigant to determine whether an unfair labor practice complaint will ultimately issue. National Labor Relations Act, § 3 (d), 29 U. S. C. § 153 (d) (1958 ed.). And the six-month limitation period of § 10 (b) of the Act, 29 U. S. C. § 160 (b) (1958 ed.), would preclude many litigants from even filing a charge with the General Counsel. Indeed, Jewel’s complaint in this very case was filed more than six months after it signed the 1957 collective bargaining agreement. “[W]e know of no case where the court has ordered reference of an issue which the administrative body would not itself *702 have jurisdiction to determine in a proceeding for that purpose.” Montana-Dakota Utilities Co. v. Northwestern Public Serv. Co., 341 U. S. 246, 254.[4]
II.
Here, as in United Mine Workers v. Pennington, ante, p. 657, the claim is made that the agreement under attack is exempt from the antitrust laws. We agree, but not on the broad grounds urged by the union.
It is well at the outset to emphasize that this case comes to us stripped of any claim of a union-employer conspiracy against Jewel. The trial court found no evidence to sustain Jewel’s conspiracy claim and this finding was not disturbed by the Court of Appeals. We therefore have a situation where the unions, having obtained a marketing-hours agreement from one group of employers, have successfully sought the same terms from a single employer, Jewel, not as a result of a bargain between the unions and some employers directed against other employers, but pursuant to what the unions deemed to be in their own labor union interests.
Jewel does not allege that it has been injured by the elimination of competition among the other employers within the unit with respect to marketing hours; Jewel complains only of the unions’ action in forcing it to accept the same restriction, the unions acting not at the behest of any employer group but in pursuit of their own policies. It might be argued that absent any union-employer conspiracy against Jewel and absent any agreement between Jewel and any other employer, the union-Jewel contract cannot be a violation of the Sherman Act. But the issue *703 before us is not the broad substantive one of a violation of the antitrust laws — was there a conspiracy or combination which unreasonably restrained trade or an attempt to monopolize and was Jewel damaged in its business? — but whether the agreement is immune from attack by reason of the labor exemption from the antitrust laws. See note 3, supra. The fact that the parties to the agreement are but a single employer and the unions representing its employees does not compel immunity for the agreement. We must consider the subject matter of the agreement in the light of the national labor policy. Cf. Bakery Drivers Union v. Wagshal, 333 U. S. 437.
We pointed out in Pennington that exemption for union-employer agreements is very much a matter of accommodating the coverage of the Sherman Act to the policy of the labor laws. Employers and unions are required to bargain about wages, hours and working conditions, and this fact weighs heavily in favor of antitrust exemption for agreements on these subjects. But neither party need bargain about other matters and either party commits an unfair labor practice if it conditions its bargaining upon discussions of a nonmandatory subject. Labor Board v. Borg-Warner Corp., 356 U. S. 342. Jewel, for example, need not have bargained about or agreed to a schedule of prices at which its meat would be sold and the unions could not legally have insisted that it do so. But if the unions had made such a demand, Jewel had agreed and the United States or an injured party had challenged the agreement under the antitrust laws, we seriously doubt that either the unions or Jewel could claim immunity by reason of the labor exemption, whatever substantive questions of violation there might be.
Thus the issue in this case is whether the marketing-hours restriction, like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions’ successful attempt to obtain that provi *704 sion through bona fide, arm’s-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and is therefore exempt from the Sherman Act.[5] We think that it is.
The Court of Appeals would classify the marketing-hours restriction with the product-pricing provision and place both within the reach of the Sherman Act. In its view, labor has a legitimate interest in the number of hours it must work but no interest in whether the hours fall in the daytime, in the nighttime or on Sundays. “[T]he furnishing of a place and advantageous hours of employment for the butchers to supply meat to customers are the prerogatives of the employer.” 331 F. 2d 547, 549. That reasoning would invalidate with respect to both service and self-service markets the 1957 provision that “eight hours shall constitute the basic work day, Monday through Saturday; work to begin at 9:00 a. m. *705 and stop at 6:00 p. to. . . .” as well as the marketing-hours restriction.
Contrary to the Court of Appeals, we think that the particular hours of the day and the particular days of the week during which employees shall be required to work are subjects well within the realm of “wages, hours, and other terms and conditions of employment” about which employers and unions must bargain. National Labor Relations Act, § 8 (d); see Timken Roller Bearing Go., 70 N. L. R. B. 500, 504, 515-516, 521 (1946), rev’d on other grounds, 161 F. 2d 949 (C. A. 6th Cir. 1947) (employer’s unilateral imposition of Sunday work was refusal to bargain); Massey Grin & Machine Works, Inc., 78 N. L. R. B. 189, 195, 199 (1948) (change in starting and quitting time); Camp & McInnes, Inc., 100 N. L. R. B. 524, 532 (1952) (reduction of lunch hour and advancement of quitting time). And, although the effect on competition is apparent and real, perhaps more so than in the case of the wage agreement, the concern of union members is immediate and direct. Weighing the respective interests involved, we think the national labor policy expressed in the National Labor Relations Act places beyond the reach of the Sherman Act union-employer agreements on when, as well as how long, employees must work. An agreement on these subjects between the union and the employers in a bargaining unit is not illegal under the Sherman Act, nor is the union’s unilateral demand for the same contract of other employers in the industry.
Disposing of the case, as it did, on the broad grounds we have indicated, the Court of Appeals did not deal separately with the marketing-hours provision, as distinguished from hours of work, in connection with either service or self-service markets. The dispute here pertains principally to self-service markets.
*706 The unions argue that since night operations would be impossible without night employment of butchers, or an impairment of the butchers’ jurisdiction, or a substantial effect on the butchers’ workload, the marketing-hours restriction is either little different in effect from the valid working-hours provision that work shall stop at 6 p. m. or is necessary to protect other concerns of the union members. If the unions’ factual premises are true, we think the unions could impose a restriction on night operations without violation of the Sherman Act; for then operating hours, like working hours, would constitute a subject of immediate and legitimate concern to union members.
Jewel alleges on the other hand that the night operation of self-service markets requires no butcher to be in attendance and does not infringe any other legitimate union concern. Customers serve themselves; and if owners want to forgo furnishing the services of a butcher to give advice or to make special cuts, this is not the unions’ concern since their desire to avoid night work is fully satisfied and no other legitimate interest is being infringed. In short, the connection between working hours and operating hours in the case of the self-service market is said to be so attenuated as to bring the provision within the prohibition of the Sherman Act.
If it were true that self-service markets could actually operate without butchers, at least for a few hours after 6 p. m., that no encroachment on butchers’ work would result and that the workload of butchers during normal working hours would not be substantially increased, Jewel’s position would have considerable merit. For then the obvious restraint on the product market — the exclusion of self-service stores from the evening market for meat — would stand alone, unmitigated and unjustified by the vital interests of the union butchers which are relied upon in this case. In such event the limitation imposed *707 by the unions might well be reduced to nothing but an effort by the unions to protect one group of employers from competition by another, which is conduct that is not exempt from the Sherman Act. Whether there would be a violation of §§ 1 and 2 would then depend on whether the elements of a conspiracy in restraint of trade or an attempt to monopolize had been proved.[6]
*708 Thus the dispute between Jewel and the unions essentially concerns a narrow factual question: Are night operations without butchers, and without infringement of butchers’ interests, feasible? The District Court resolved this factual dispute in favor of the unions. It found that “in stores where meat is sold at night it is impractical to operate without either butchers or other employees. Someone must arrange, replenish and clean the counters and supply customer services.” Operating without butchers would mean that “their work would be done by others unskilled in the trade,” and “would involve an increase in workload in preparing for the night work and cleaning the next morning.” 215 F. Supp., at 846. Those findings were not disturbed by the Court of Appeals, which, as previously noted, proceeded on a broader ground. Our function is limited to reviewing the record to satisfy ourselves that the trial judge’s findings are not clearly erroneous. Fed. Rules Civ. Proc. 52 (a).
The trial court had before it evidence concerning the history of the unions’ opposition to night work, the development of the provisions respecting night work and night operations, the course of collective bargaining negotiations in 1957, 1959, and 1961[7] with regard to those provisions, and the characteristics of meat marketing insofar as they bore on the feasibility of night operations without butchers.
The unions’ opposition to night work has a long history. Prior to 1919 the operating hours of meat markets in Chicago were 7 a. m. to 7 p. m., Monday through Friday; *709 7 a. m. to 10 p. m. on Saturday, and 7 a. m. to 1 p. m. on Sunday. Butchers worked the full 81-hour, seven-day week. The Chicago butchers’ strike of 1919 was much concerned with shortening working hours, and the resulting contract, signed in 1920, set the working day at 8 a. m. to 6 p. m., Monday through Friday, and 8 a. m. to 9 p. m. on Saturday. Various alterations in the hours were made in 1937, 1941, 1945, 1946, and again in 1947, when the present working hours (9 a. m. to 6 p. m., Monday through Saturday) were established. In a mail ballot conducted by the unions in October 1962, Jewel’s meat cutters voted 759 to 28 against night work.
Concomitant with the unions’ concern with the working hours of butchers was their interest in the hours during which customers might be served. The 1920 agreement provided that “no customers will be served who come into the market after 6 P. M. and 9 P. M. on Saturdays and on days preceding holidays . . . .” That provision was continued until 1947, when it was superseded by the formulation presently in effect and here claimed to be unlawful:
“Market operating hours shall be 9:00 a. m. to 6:00 p. m. Monday through Saturday, inclusive. No customer shall be served who comes into the market before or after the hours set forth above.”
In 1947, Jewel had just started investigating the self-service method of meat vending. It introduced that method in the Chicago area in 1948 and in the territory of these unions in 1953.
During the 1957 negotiations numerous proposals for relaxation of the operating-hours restriction were presented by the employer group. Each of these proposals, including that submitted separately by Jewel for consideration at the unions’ ratification meetings, combined a provision for night operations with a provision for a more flexible workday that would permit night employment *710 of butchers. Such juxtaposition of the two provisions could, of course, only serve to reinforce the unions’ fears that night operations meant night work. Jewel did allege in its complaint, filed in July 1958, that night operations were possible without butchers, but even in the 1959 bargaining sessions Jewel failed to put forth any plan for night operations that did not also include night work. Finally, toward the end of the 1961 negotiations, Jewel did make such a suggestion, but, as the trial judge remarked, the “unions questioned the seriousness of that proposal under the circumstances.” 215 F. Supp., at 843.
The unions’ evidence with regard to the practicability of night operations without butchers was accurately summarized by the trial judge as follows:
“[I]n most of plaintiff’s stores outside Chicago, where night operations exist, meat cutters are on duty whenever a meat department is open after 6 P. M. . . . Even in self-service departments, ostensibly operated without employees on duty after 6 P. M., there was evidence that requisite customer services in connection with meat sales were performed by grocery clerks. In the same vein, defendants adduced evidence that in the sale of delicatessen items, which could be made after 6 P. M. from self-service cases under the contract, ‘practically’ always during the time the market was open the manager, or other employees, would be rearranging and restocking the cases. There was also evidence that even if it were practical to operate a self-service meat market after 6 P. M. without employees, the night operations would add to the workload in getting the meats prepared for night sales and in putting the counters in order the next day.” 215 F. Supp., at 844.
*711 Jewel challenges the unions’ evidence on each of these points — arguing, for example, that its preference to have butchers on duty at night, where possible under the union contract, is not probative of the feasibility of not having butchers on duty and that the evidence that grocery clerks performed customer services within the butchers’ jurisdiction was based on a single instance resulting from “entrapment” by union agents. But Jewel’s argument— when considered against the historical background of union concern with working hours and operating hours and the virtually uniform recognition by employers of the intimate relationship between the two subjects, as manifested by bargaining proposals in 1957, 1959, and 1961— falls far short of a showing that the trial judge’s ultimate findings were clearly erroneous.

Reversed.

 The practice in the Chicago area is for the employers and the butchers to execute separate, but similar, collective bargaining agreements for self-service and service markets. A self-service market is “one in which fresh beef, veal, lamb, mutton or pork are available for sale on a prepackage self-service basis.” Semi-self-service markets, those in which fresh meat is made available on a prepackaged basis but there is also a service counter offering custom cutting for those who prefer it, are governed by the self-service contract. Service markets are those in which no fresh meat is made available on a self-service basis.

 Action upon the separate petition of Associated and Bromann, No. 321 Oct. Term, 1964, has been withheld, pending disposition of this ease.

 The grant of certiorari was limited to the following questions:
“1. Based on the District Court’s undisturbed finding that the limitation 'was imposed after arm’s length bargaining, . . . and was fashioned exclusively by the unions to serve their own interests— how long and what hours members shall work, what work they shall do, and what pay they shall receive,’ whether the limitation upon market operating hours and the controversy concerning it are within the labor exemption of the Sherman Antitrust Act.
“2. Whether a claimed violation of the Sherman Antitrust Act which falls within the regulatory scope of the National Labor Relations Act is within the exclusive primary jurisdiction of the National Labor Relations Board.”

 To be distinguished are the pre-emption cases in which the possibility that the Board may not exercise jurisdiction renders state courts no less powerless to act, see San Diego Building Trades Council v. Garmon, 359 U. S. 236, 245-246. See generally, Teamsters Local 20 v. Morton, 377 U. S. 252.

 The crucial determinant is not the form of the agreement — e. g., prices or wages — but its relative impact on the product market and the interests of union members. Thus in Teamsters Union v. Oliver, 358 U. S. 283, we held that federal labor policy precluded application of state antitrust laws to an employer-union agreement that when leased trucks were driven by their owners, such owner-drivers should receive, in addition to the union wage, not less than a prescribed minimum rental. Though in form a scheme fixing prices for the supply of leased vehicles, the agreement was designed “to protect the negotiated wage scale against the possible undermining through diminution of the owner’s wages for driving which might result from a rental which did not cover his operating costs.” Id., at 293-294. As the agreement did not embody a “ 'remote and indirect approach to the subject of wages’ . . . but a direct frontal attack upon a problem thought to threaten the maintenance of the basic wage structure established by the collective bargaining contract,” id., at 294, the paramount federal policy of encouraging collective bargaining proscribed application of the state law. See also Meat Drivers v. United States, 371 U. S. 94, 98; Milk Wagon Drivers’ Union, Local No. 753 v. Lake Valley Farm Products, Inc., 311 U. S. 91.

 One issue, for example, would be whether the restraint was unreasonable. Judicial pronouncements regarding the reasonableness of restraints on hours of business are relatively few. Some cases appear to have viewed such restraints as tantamount to limits on hours of work and thus reasonable, even though contained in agreements among competitors. Thus in Chicago Board of Trade v. United States, 246 U. S. 231, the Court upheld a rule of a grain exchange that had the form of a restriction on prices of transactions outside regular trading hours but was characterized by the Court as a rule designed to shift transactions to the regular trading period, i. e., to limit hours of operation. The Court, per Mr. Justice Brandéis, stated:
“Every board of trade and nearly every trade organization imposes some restraint upon the conduct of business by its members. Those relating to the hours in which business may be done are common; and they make a special appeal where, as here, they tend to shorten the working day or, at least, limit the period of most exacting activity.” 246 U. S., at 241. (Emphasis added.) See also La Duc v. Teamsters & Chauffeurs Union, Local No. 43, 1946-1947 Trade Cas., ¶ 57,631 (Wis. Cir. Ct. 1947); Cielesz v. Local 189, Amalgamated Meat Cutters, 25 Ill. App. 2d 491, 167 N. E. 2d 302 (1960).
Other cases have upheld operating-hours restraints in factual circumstances that make it seem likely that the agreement affected hours of operation and hours of work in equal measure but without stressing that fact. See Dunkel Oil Corp. v. Anich, 1944-1945 Trade Cas., ¶ 57,306 (D. C. E. D. Ill. 1944); Baker v. Retail Clerks Assn., 313 Ill. App. 432, 40 N. E. 2d 571 (1942); Stovall v. McCutchen, 107 Ky. 577, 54 S. W. 969 (1900).
Kold Kist, Inc. v. Amalgamated Meat Cutters, Local No. 421, 99 Cal. App. 2d 191, 221 P. 2d 724 (1950), held unreasonable a union-employer agreement limiting night sales of frozen poultry, which had previously been obtained from the plaintiff-distributor. The plaintiff alleged, however, that it had been severely affected, since many stores had stopped carrying its products entirely due to the lack of storage *708 facilities in which to keep the poultry during hours in which sale was prohibited, and such effects may be atypical.
The decided cases thus do not appear to offer any easy answer to the question whether in a particular case an operating-hours restraint is unreasonable.

 In 1959, and again in 1961, new collective bargaining agreements containing the challenged provision were executed. In each instance, Jewel reserved its position with respect to this litigation.