**SIGNATORY NEGOTIATING COMMITTEE, Plaintiff,**

v.

**LOCAL 9, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL–CIO, Defendant.**

**Civ. A. No. 76 M 827.**

United States District Court, D. Colorado.

April 5, 1978.

David R. Gorsuch, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for plaintiff.

Walter C. Brauer III, Denver, Colo., for defendant.

## MEMORANDUM OPINION AND ORDER FOR JUDGMENT

MATSCH, District Judge.

Invoking the jurisdiction granted by 29 U.S.C. § 185 and 28 U.S.C. § 1337, the parties have, upon stipulated facts, respectively moved for a summary judgment declaring the validity or invalidity of a subcontracting provision of a collective bargaining agreement under federal antitrust laws. Plaintiff, Signatory Negotiating Committee (Committee), is the collective bargaining agent for those employers in the building, heavy engineering and utility construction industry in Colorado who have assigned their rights to negotiate collective bargaining agreements with a number of labor organizations, including the defendant, Local 9, International Union of Operating Engineers, AFL–CIO, (Union).

Committee does not represent any trade association; it negotiates with Union only for individual contractors who perform work calling for the skills of operating engineers. Each such contractor is an employer engaged in commerce and in an industry affecting commerce, within the meaning of 29 U.S.C. § 152(2), (6) and (7) and 15 U.S.C. § 7. The representative role of the plaintiff makes it also an employer within the scope of those statutory provisions.

Many of the individual contractors have an annual gross business volume exceeding $1,000,000.00 and they make purchases of equipment, materials and supplies from outside of Colorado, for use in Colorado, of the value of more than $1,000,000.00 annually.

Union is a labor organization of more than 5,000 members whose craft is almost unique in its relationship with virtually all other crafts involved in the construction industry. Thus, while the primary task of operating engineers is the movement of earth for constructing and maintaining roads and highways, dams, waterways, and cross-country utility construction, they also service the other crafts by moving machinery, equipment, material and supplies for millwrights, electricians, masons, glaziers, carpenters, iron workers, plumbers, laborers and others. Cooperation and harmony among all of the crafts at the job site are vitally important to achieve the coordination necessary for completion of a construction project, often involving multiple employers, including subcontractors. A majority of contractors who employ operating engineers work both as general contractors on some jobs and as subcontractors on other jobs. General contractors often make decisions during bid preparations about subcontracting the work of operating engineers and the same contractor may make different decisions about the use of subcontractors on various jobs. At times, the decision to use subcontractors may be made while the project is in progress. For example, a general contractor may employ engineers to operate and maintain fork lifts and cranes. If more cranes are needed, or if there is a requirement for a crane with special capabilities, a subcontract may be used. Then, the operating engineers employed by the subcontractor will be working directly with the employees of the general contractor.

Subcontracts are also used for unit work. On-site preparation, foundation and caisson work, material handling and exterior land finishing could all be subcontracted at the site of a building project. Bridges, curbing and culvert installation can be subcontracted on a highway construction job.

Operating engineers work with a wide variety of equipment. Most contractors tend to specialize and do not do all kinds of construction work at any one time. Accordingly, no signatory contractor owns or leases all types of equipment at any given time. When the work requires the use of equipment which the contractor does not have he may buy or lease it for operation by his own employees, or he may subcontract that part of the work to a contractor with such equipment.

For more than thirty years, the plaintiff and defendant have had a collective bargaining relationship covering work to be done at the site of the construction, alteration, painting or repair of a building, structure, or other work. They have periodically negotiated a Master Agreement. The current agreement, which will expire on April 30, 1978, contains the following provisions as Article XVI:

Application to Subcontractors

(A) On-Site Work.

1. With respect to on-site work covered by this Agreement, that is, work done or to be done at the site of the construction, alteration, painting or repair of a building, structure or other work:

a) The terms and conditions of this Agreement insofar as it affects the Contractor shall apply equally to any Subcontractor under the control of, or working under contract with such Contractor on any on-site work covered by this Agreement, and said Subcontractor with respect to such on-site work shall be considered the same as a Contractor covered hereby.

b) If a Contractor shall subcontract on-site work as herein defined and covered by this Agreement, provision shall be made in such subcontract for the observance by said Subcontractor of the terms of this Agreement as to such work.

2. It is distinctly understood and agreed that this Agreement does not cover any other jobs or projects of the Subcontractor and terminates contemporaneously with the termination of such subcontract with Contractor.

3. The foregoing shall not apply to the Local Production of Material by any

commercial supplier of such materials who has been and is engaged in the business of supplying such materials to the public generally from any designated site or sites other than on the project or projects of the Contractor.

(B) Definition of Subcontractor.

A Sub-contractor is defined as any person other than an Employee covered by this Agreement, firm or corporation who or which agrees orally or in writing to perform, or who or which in fact performs for or on behalf of a Contractor, any part or portion of the work covered by this Agreement.

(C) This Article, APPLICATION TO SUBCONTRACTORS, shall not apply to the following miscellaneous types of work: striping, seeding, mulching, and planting of trees, shrubs and flowers.

(D) It is distinctly understood and agreed between the Contractor and the Union that this Article has no application to any person or entity on any job or project or in the performance of any work by the person or entity when the person or entity is not a Sub-contractor as defined in (B) above, and that no Subcontractor as defined in (B) above may be requested or required by the Union while acting and working as a subcontractor as defined in (B) above to execute any agreement with the Union except a job agreement applicable only to such subcontracted work covered by this Agreement.

The parties have agreed that neither of them intended to restrict access to bidding or performing subcontract work through this article. The Union has by this means sought to insure payment of the same wages and fringe benefits by all employers of operating engineers on the same site and to minimize friction between union and non-union workers at that site. There has not been a refusal to subcontract with non-union employers as a result of this article and union contractors who have not assigned their bargaining rights to the plaintiff. or otherwise agreed to become bound by the Master Agreement have not been systematically excluded from subcontracts as a result of this agreement.

In addition to the Master Agreement, the Union enters into contracts with individual employers with a Short Form Agreement which does not involve the plaintiff. The Short Form Agreement incorporates many of the provisions of the Master Agreement by reference, excepting, among others, the arbitration provisions. The Short Form Agreement has been used as a project agreement, applicable only to one identified work project. It has also been used for non-union contractors who successfully bid on some portion of the work on a project being constructed by substantially all union contractors.

The use of the Short Form Agreement as a project agreement has been one method of enforcing the subcontract requirements of Article XVI. The other method is to require the general contractor to include appropriate terms in the subcontract and a failure to enforce those provisions will then become a violation of the general contractor's obligations under the Master Agreement.

The union security provisions of the Master Agreement become applicable to subcontractors when they have been working on the project for 31 days. The employees of the subcontractor must then become union members. The hiring hall provisions of the Master Agreement are enforced if additional workers are needed by the subcontractor at the project site. None of the provisions of the Master Agreement is enforced against the non-consenting contractors for any locations other than the site at which the covered subcontract work is being performed.

Article XVI serves to protect negotiated wages from erosion through the use of cheaper labor. It also minimizes the use of subcontracting, thereby preserving work which the union workers have traditionally performed. Additionally, it reduces the

possibility of disruption of the close community of interests on the construction project site, and it tends to prevent friction by decreasing the likelihood of mixing union and nonunion employees on the same project.

Shortly after the Sherman Act was enacted, the Supreme Court applied its proscriptions to combinations by labor organizations. *Loewe v. Lawlor*, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488 (1908). Six years later, Congress passed the Clayton Act, two sections of which created labor's first exemption from the antitrust laws. Section 6, 15 U.S.C. § 17, provides:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objectives thereof; . . .

Section 20, 29 U.S.C. § 52, limited the power of federal courts to issue injunctions in cases "involving, or growing out of, a dispute concerning terms or conditions of employment." The section also provided that certain enumerated union actions were not to be found violative of "any law of the United States."

In 1921, the Supreme Court held in *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 469 [41 S.Ct. 172, 177, 65 L.Ed. 349] (1921), that neither Sections 6 nor 20 permitted secondary boycotts, and observed:

> . . . [T]here is nothing in [§ 6] to exempt such an organization or its members from accountability where it or they depart from its normal and legitimate objects and engage in an actual combination or conspiracy in restraint of trade.

Congress responded in 1932 with the Norris-La Guardia Act, 29 U.S.C. §§ 104, 105 & 113, further restricting the courts' ability to intervene in labor disputes and again limiting the applicability of the Sherman Act as a restriction on labor union activities.

The Supreme Court recognized that intent of Congress in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 503–04, [60 S.Ct. 982, 997, 84 L.Ed. 1311] (1940), and, in holding that a sitdown strike accompanied by violence was exempt from the antitrust laws, said

> . . . [A]n elimination of price competition based on differences in labor standards is the objective of any national labor organization. But this effect on competition has not been considered to be the kind of curtailment of price competition prohibited by the Sherman Act.

In *United States v. Hutcheson*, 312 U.S. 219 [61 S.Ct. 463, 85 L.Ed. 788] (1941), the Supreme Court attempted to harmonize the Sherman Act, the Clayton Act and the Norris-La Guardia Act in these words:

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.* at 232, 61 S.Ct. at 466.

Four years later, in *Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, [65 S.Ct. 1533, 89 L.Ed. 1939] (1945), the Court reaffirmed *Hutcheson* but held the union subject to antitrust liability because its agreement with industry was "looking not merely to terms and conditions of employment but also to price and market control." *Id.* at 799–800, 65 S.Ct. at 1535.

The Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.*, and the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.*, were major enactments establishing national policy in matters of organized labor. These statutes were fully debated in the Congress and there were those who urged the restriction of union activities by application of anti-

trust principles. That approach was rejected and on both occasions the lawmakers clearly expressed an intention to address apparent abuses of economic and political power of labor organizations through substantive and procedural provisions specifically designed for that purpose. See discussions of legislative history in *Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 707, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (separate opinion of Goldberg, J.); *Bodine Produce, Inc. v. United Farm Workers Organizing Committee*, 494 F.2d 541, 555–56 (9th Cir. 1974).

These labor laws reflect a social policy involving humanistic values far different from the economic model of free market competition protected by the antitrust statutes. The mutual exclusivity of these systems regulating business competition and organized labor is more apparent as an abstraction than it is in the actual interplay of forces in any given factual context. When labor organizations and business enterprises combine for purposes which are destructive of competition, without any corresponding benefits for unions or the collective bargaining process, the Supreme Court has intervened with applications of antitrust principles.

So, in *United Mine Workers v. Pennington*, 381 U.S. 657, [85 S.Ct. 1585, 14 L.Ed.2d 626] (1965) the Court determined that the union was exposed to liability for the anticompetitive effects of an agreement with large coal producers to establish an industry-wide, all-purpose wage scale with a predatory intent to drive small producers out of the market. Yet, on the same day, the Court decided *Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, [85 S.Ct. 1596, 14 L.Ed.2d 640] (1965), holding that a union's imposition of restrictions on marketing hours was exempt from antitrust liability because it was "intimately related to wages, hours and working conditions" and resulted from "bona fide, arm's-length bargaining in pursuit of their own labor policies, and not at the behest of or in combination with nonlabor groups . . . ." *Id.* at 689–90, 85 S.Ct. at 1602.

The concerns of the parties in this action result, primarily, from the majority opinion in *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, [95 S.Ct. 1830, 44 L.Ed.2d 418] (1975). There, Connell, a contractor in the construction industry, sought judicial invalidation of a subcontracting agreement, forced upon it by union picketing, as a restraint of trade. The coerced contract required Connell to contract or subcontract work within the union's jurisdiction only to firms who were parties to a bargaining agreement with that union. The union was a party to a multiemployer bargaining agreement with an association of contractors, which contract contained a "most favored nation" clause which provided that in the event the union granted more favorable terms to any other employer, those same terms must then be extended to all members of the association. A union security clause was also included in the association agreement. Before the union picketing, Connell did not itself employ any workers in the union's trade and it had no previous collective bargaining relationship with the union.

The majority of the Court found that the coerced agreement was a direct restraint on the "business market" through the indiscriminate exclusion of non-union subcontractors. The perceived effect of the "most favored nation" clause in the multiemployer contract was the elimination of competition between association members and other subcontractors because the union would not make any agreement which could give an unaffiliated contractor any competitive advantage over those who were in the association. Accordingly, the association members were sheltered from the threat of outside competition as to all of the subjects covered by their agreement, including matters unrelated to wages, hours and working conditions.

Because the Connell subcontracting agreement not only prohibited the use of non-union employers, but required subcontractors to have a contract with the particular local union, that union gained the power to control access to the market for mechani-

cal subcontracting work. That power could be used for purposes unrelated to the legitimate goals of organized labor. While conceding that there was no evidence that the union sought anything other than organizing subcontractors, the Court cited *United Mine Workers v. Pennington, supra* and concluded:

> This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

421 U.S. at 625, 95 S.Ct. at 1836.

The union also argued that the agreement with Connell was expressly authorized by the construction-industry proviso to the prohibition of secondary activity in § 8(e) of the LMRA, 29 U.S.C. § 158(e), thereby constituting an implied statutory exemption to antitrust proscriptions. That contention was rejected by a restrictive reading of the site agreement exclusion to § 8(e) as applicable only to agreements made "in the context of collective-bargaining relationships," and, probably, to "common-situs relationships on particular jobsites as well." 421 U.S. at 633, 95 S.Ct. at 1840. Accordingly, the agreement in *Connell* would be illegal under § 8(e). The Court concluded that such illegality did not exempt the union from antitrust suits because the majority found nothing in the legislative history to suggest that Congress intended the remedies in the LMRA to be exclusive of antitrust remedies for the same prohibited conduct.

Such separate and independent analyses of the limitations of antitrust and labor laws seem inconsistent with the Supreme Court's recognition of an implied policy exemption from antitrust liability for activity which is within the recognized purposes of labor unions as reflected in *Hutcheson, supra*, and in *Jewell Tea, supra*. One reading those opinions might have expected the Court to conclude that because the Congress had prohibited the kind of coerced "top down organizing" which the union imposed in *Connell* by the provisions of the LMRA, the subject was a matter of labor law and should be excluded from consideration as to its effects on competition under the antitrust statutes. That result could have been reached as a policy exemption regardless of the analysis of the scope of the private remedy granted by § 303 of the LMRA, 29 U.S.C. § 187, made in the dissenting opinion of Mr. Justice Stewart.

■ Under any view of the holding and opinion in *Connell*, it is not controlling here because of significant factual differences. Of primary importance is the fact that while the individuals who compose the Signatory Negotiating Committee are appointed by the president of the Colorado Contractors Association (an incorporated trade association of contractors) the committee's representation is not for the association; it is for individual contractors who have assigned bargaining rights, whether they are members of the CCA, another trade association, or unaffiliated with any contractors' organization. Thus, there is no tendency toward restricting competition from employers who are outside of a trade association.

Another significant difference is that the subcontracting provisions of Article XVI have evolved through more than thirty years of negotiations in a collective bargaining context, and are contained in the current collective bargaining agreement between the parties.

A third important distinction is that while the subcontractors in this case must accept the terms and conditions of the Master Agreement, they are not required to contract with the union. Those who do sign the Short Form Agreement as a project agreement are not required to recognize the union for any purposes and on any jobs which are not connected with the particular project and site covered under the terms and within the area of the Master Agreement. While it must be accepted that the applicability of the union security clause

after 31 days on the site will have some organizing effect, that is only an incidental consequence and the parties have stipulated that many subcontracts on such construction projects will not last for a full thirty days. The hiring hall provisions are also enforced only to the extent of a need for additional employees after the subcontractor has begun the work. There is no requirement for replacement of non-union employees on his payroll.

If these provisions are to be condemned as "top down organizing" it is better that restrictions on such activity by unions be made in the regulatory laws governing labor organizations than by attempting to address them under antitrust principles.

The Master Agreement contains a "most favored nation clause." *Connell* did not hold that such a clause was *per se* an illegal restraint of trade. The anticompetitive effect in *Connell* resulted from the fact that the contract containing such a clause was with an association of contractors and the inhibition of the union in granting advantages to others had the necessary consequence of benefiting members of the association.

The exemption of labor union activity and of collective bargaining contracts from the antitrust laws is dependent upon an analysis of the extent to which legitimate labor objectives are advanced by that which can be considered to have anticompetitive consequences. A union and an employer in the context of collective bargaining can reach an agreement which will have anticompetitive effects if the primary benefits are to matters of wages and working conditions. The combination of employers for the limited purpose of conducting negotiations with the union through a representative committee, open to all who choose to assign their bargaining rights, does not alter this exemption from antitrust consequences. Conversely, unions cannot use the guise of protecting labor concerns to impose direct restraints on a business market through agreements or combinations with non-labor organizations.

Clearly the predominant interests involved in the agreement in this case are matters which are well within the legitimate concerns of organized labor as reflected in the policy established by the enactment of national labor legislation. Accordingly, Article XVI must be held to be exempt from the antitrust laws. Having reached that conclusion, it is not necessary to consider whether there can be any additional exemption implied from the proviso in Section 8(e) of the LMRA, and it is not necessary to determine whether anything in the application of the agreement could be considered to be an unfair labor practice.

Having concluded that the subject agreement is excluded from antitrust regulation, it is

ORDERED that the complaint herein is dismissed and judgment shall be entered for the defendant, without costs.