FRITO–LAY, INC., Plaintiff,

v.

RETAIL CLERKS UNION LOCAL NO. 7, Chartered by the Retail Clerks International Association, Defendant.

Civ. A. No. 77 M 511.

United States District Court,
D. Colorado.

July 5, 1978.

Charles J. Kall and Stuart N. Bennett, Holme, Roberts & Owen, Denver, Colo., Duane C. Aldrich, Kilpatrick, Cody, Rogers McClatchey & Regenstein, Atlanta, Ga., attys., for plaintiff.

Walter C. Brauer, III and Thomas B. Buescher, Brauer & Simons, Denver, Colo., attys., for defendant.

## MEMORANDUM OPINION AND ORDER

MATSCH, Judge.

From the pleadings, the affidavits submitted in support of the defendant's motion for summary judgment and of the plaintiff's motion for partial summary judgment, the respective briefs and the statements of counsel at the hearing held on April 7, 1978, it is apparent that there is no genuine dispute as to the material facts necessary for a final disposition of this case under Rule 56 of the Federal Rules of Civil Procedure.

Frito-Lay, Inc. ("Frito-Lay") manufactures and sells snack food products throughout the United States. It maintains distribution and sales facilities in metropolitan Denver, Colorado, from which it services retail outlets in that area through the services of non-union employees.

The Retail Clerks Union Local No. 7, Chartered by the Retail Clerks Internation-

al Association ("Clerks") is a labor organization which is the bargaining representative of "all employees actively engaged in the handling and selling of merchandise" who are employed by members of the Denver Retail Grocers ("Grocers"), a multi-employer bargaining group comprised of Safeway Stores, Inc., King Soopers, Inc. and Albertson's, Inc.

The Colorado-Wyoming Joint Council of Teamsters ("Teamsters") is comprised of Teamster locals located in those two states. The Teamsters represent the dairy drivers and the bread and bakery drivers in the Denver metropolitan area, excepting cookie company drivers.

In March, 1976, the Clerks and Grocers were in negotiations for a collective bargaining agreement to replace that which was to expire on April 30, 1976. In those negotiations Clerks demanded a prohibition of the existing practice of Frito-Lay and other suppliers using route salesmen and delivery drivers to shelve, price, and rotate their products in the stores.

Frito-Lay's national marketing approach is based upon in-store merchandising through uniform practices and procedures to provide fresh merchandise in an attractive display. All Frito-Lay route salesmen are trained in these techniques and they are paid on a salary plus commission basis.

The procedure prescribed by Frito-Lay calls for the route salesman to enter the store, check the Frito-Lay merchandise and rotate the stock by placing the oldest code dates in front of the display. He may then determine the customer's needs, return to the truck to prepare the order, and then take the merchandise into the store where he prices and shelves the packages.

During the Grocers' contract negotiations, Clerks and Teamsters arrived at an understanding which resulted in Clerks recognizing an exemption of all bakery goods and dairy products drivers from the demand for preclusion of in-store servicing of merchandise by persons not within the bargaining unit.

The Grocers accepted that modified demand and an agreement was executed on May 1, 1976, containing the following provision in Article 1, Section 1:

Effective July 1, 1976, all rack jobbers and driver salesmen will make their deliveries to the back room at which time it will become bargaining unit work exclusively with the following exceptions:

Bread or bakery drivers and dairy drivers shall be allowed to continue as they have in the past.

If the Employer violates this Section by using non-bargaining unit people, then the Employer will pay to the most senior part-time clerk an amount equal to the journeymen clerk rate for the time spent by a non-bargaining unit person performing bargaining unit work.

Frito-Lay claims that the enforcement of that provision has caused a reduction in its sales in the Grocers' stores and interfered with its marketing methods. By this civil action, it seeks injunctive relief and damages upon claims of violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 8(b)(4)(A), (B), (D) and Section 8(e) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(b)(4)(A), (B), (D) and § 158(e). Jurisdiction exists pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, 29 U.S.C. § 187 and 28 U.S.C. § 1337.

The amended complaint's first claim for relief alleges that Clerks entered into a combination, contract or conspiracy with Teamsters to restrain trade by preventing Frito-Lay and other such distributors from delivering and servicing their products in violation of § 1 of the Sherman Act and that the contract provision itself is violative of § 1 of the Sherman Act and of § 8(e) of the NLRA.

The second claim for relief alleges that the Clerks' conduct in "forcing" Grocers to accept the provision constituted an unfair labor practice under § 8(b)(4)(A), (B) and (D) of the NLRA, 29 U.S.C. § 158(b)(4)(A), (B) and (D) for which the plaintiff has a damage remedy under 29 U.S.C. § 187.

## THE ANTITRUST CLAIMS

The claim that the agreement between Clerks and Teamsters is a conspiracy in restraint of trade and the claim that the Grocers' contract provision is illegal are both within the recognized national policy exempting labor organizations from antitrust liability for actions taken to advance legitimate labor objectives.

The statutory and judicial history of that exemption was examined at great length by Mr. Justice Goldberg in his separate opinion in *Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 697, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), where the majority held that a union's imposition of restrictions on marketing hours was exempt from antitrust liability because it was "intimately related to wages, hours and working conditions" and resulted from "bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups . . . ." *Id.* at 689–90, 85 S.Ct. at 1602. In *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Court invalidated a subcontracting agreement forced upon a general contractor by union picketing outside of a collective bargaining relationship. The Court held:

> This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not *flow naturally from the elimination of competition over wages and working conditions.* It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws. (emphasis added)

*Id.* at 625, 95 S.Ct. at 1836.

This court recently interpreted *Jewel Tea* and *Connell Construction Co.* in deciding the validity of a subcontracting restriction in a collective bargaining agreement in *Signatory Negotiating Committee v. Local 9, International Union of Operating Engineers,* 447 F.Supp. 1384 (D.Colo.1978). There, I reached the following conclusion:

The exemption of labor union activity and of collective bargaining contracts from the antitrust laws is dependent upon an analysis of the extent to which legitimate labor objectives are advanced by that which can be considered to have anticompetitive consequences. *A union and an employer in the context of collective bargaining can reach an agreement which will have anticompetitive effects if the primary benefits are to matters of wages and working conditions. . . .* Conversely, unions cannot use the guise of protecting labor concerns to impose direct restraints on a business market through agreements or combinations with non-labor organizations. (emphasis added)

*Id.* at 1391.

■ The Clerks' efforts to obtain the driver-salesman preclusion clause resulted from a legitimate concern for working conditions and the protection of jobs for the bargaining unit. Such preservation of work is a recognized, legitimate goal of organized labor. There is nothing in this record to suggest that the Clerks sought "price and market control," *Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers,* 325 U.S. 797, 800, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), or "to prescribe labor standards outside the bargaining unit," *United Mine Workers v. Pennington,* 381 U.S. 657, 668, 85 S.Ct. 1585, 1592, 14 L.Ed.2d 626 (1965), or to impose "direct restraint[s] on the business market," *Connell Construction Co., supra,* 421 U.S. at 625, 95 S.Ct. at 1836.

■ If a union's agreement with a non-labor group such as the Retail Grocers here is protected by the exemption, then certainly an agreement with another union to help obtain that clause, while potentially violative of federal *labor* proscriptions, cannot also be subject to *antitrust* liability. See *Bodine Produce, Inc. v. United Farm Worker's Organizing Committee,* 494 F.2d 541, 557–58 (9th Cir. 1974); and *Afran Transport Co. v. National Maritime Union,* 169 F.Supp. 416, 423–24 (S.D.N.Y.1958). *Cf. Connell Construction Co., supra,* 421 U.S. at

634 n. 16, 95 S.Ct. 1830 (inference that exemption presently applies to union-union agreements); and *United States v. Hutcheson,* 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941) ("So long as a union acts in its self-interest and does not combine with non-labor groups . . . ", the exemption applies.)

### SECTIONS 8(e) & 8(b)(4)(A) and (B) of the N.L.R.A.

Section 8(e) of the NLRA, 29 U.S.C. § 158(e) provides:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void . . . .

Section 8(b)(4)(A) and (B), 29 U.S.C. § 158(b)(4)(A) and (B) provide:

It shall be an unfair labor practice for a labor organization or its agents—

(4)(ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

(A) forcing any employer or self-employed person to join any labor or employer organization or to enter any agreement which is prohibited by subsection (e) of this section [§ 8(e)];

(B) forcing or requiring any person to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . .

Frito-Lay contends that the driver-salesman clause in the collective bargaining agreement is facially violative of § 8(e) and that the Union's actions in obtaining that provision constitute an unfair labor practice within the meaning of §§ 8(b)(4)(A) and (B).

The Supreme Court in *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 644–45, 87 S.Ct. 1250, 1268, 18 L.Ed.2d 357 (1967), said that the determination of a violation of Sections 8(e) and 8(b)(4)(A) and (B) requires

. . . an inquiry into whether, under all the surrounding circumstances, *the Union's objective was preservation of work for [the employer's] employees, or whether the agreements and boycott were tactically calculated to satisfy union objectives elsewhere.* Were the latter the case, . . . the boycotting employer, would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer, . . . for the activity to fall within that category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees or other employees of the primary employer thus making the agreement or boycott secondary in its aim. *The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees.* (emphasis added)

The efforts of the employees of the primary employer directed at the labor practices of their employer are protected as long as their purpose is not to affect labor practices elsewhere. Neither § 8(e) nor §§ 8(b)(4)(A) & (B) prohibit such activity if it is engaged in with the object of preserving work traditionally performed by the employees for that employer. *NLRB v. Pipefitters,* 429 U.S. 507, 517, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977).

Clerks' members have always been responsible for the stocking, rotating, shelving and pricing of most of the merchandise in the Grocers' stores. While the collective bargaining agreement has changed the practice with respect to Frito-Lay products so that now the plaintiff's drivers must

leave the merchandise in the storerooms to be priced and shelved by members of the bargaining unit, that change is not new work acquisition.

The Sixth Circuit was presented with a fact situation virtually identical to that in the instant case in *Canada Dry Corp. v. NLRB,* 421 F.2d 907 (1970). There, the court applied the *National Woodwork* standard to a provision in the collective bargaining agreement between the Retail Clerks and retail food chains which prohibited other persons from engaging in work activity "customarily performed" by store clerks. *Id.* at 908. The challenge was brought by manufacturers and distributors of beverages, cookies and crackers. The court refused to "define the area of the clerks' legitimate job protection efforts according to brand name or supplier" especially because of the express finding that in-store servicing of the "vast majority" of store merchandise, including goods similar to the plaintiffs' products, was done by store clerks. Because there was no evidence of a secondary objective, the court found no violation of section 8(e).

■ The Clerks in this action have not engaged in the type of secondary activity forbidden by §§ 8(e) and 8(b)(4). The Grocers are not "neutral" employers caught in the middle of a dispute between a union and another employer. The labor practices sought to be changed were those of the employer, with whom the union bargained and no effort was made by the union to induce or encourage Frito-Lay's employees to become members of Clerks' or any other union. The store clerks have been claiming the work performed by driver-salesmen for many years. As in *Canada Dry,* this is not a situation where they are attempting to "monopolize jobs or acquire new tasks. Rather, these were the type of jobs which the clerks had traditionally done and for which they had the skills and experience." *Id.* at 909–10. The finding that the efforts of the union in this case were directed towards work preservation, combined with the conclusion that no secondary employer or dispute is involved, compels dismissal of the claims of violations of § 8(e) or §§ 8(b)(4)(A) and (B).

SECTION 8(b)(4)(D) of the N.L.R.A.

Plaintiff sought a partial summary judgment on its claim that the defendant committed an unfair labor practice within the meaning of § 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D). That section provides:

It shall be unfair labor practice for a labor organization or its agents—

(4)(ii) to threaten, coerce or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather to employees in another labor organization or in another trade, craft or class

. . . . .

■ This section of the NLRA is "aimed at protecting the employer trapped between the claims" of rival employee groups. *N. L. R. B. v. Local 825, International Union of Operating Engineers,* 400 U.S. 297, 305, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). It is not intended to prohibit a union from engaging in activities designed to further its legitimate interest in work preservation. *See* Leslie, D., *The Role of the NLRB and the Courts in Resolving Union Jurisdictional Disputes,* 75 Colum.L.Rev. 1470 (1975). If a union's activities are protected from liability under § 8(b)(4)(B) because of a valid work preservation motive, then *a fortiori,* the union cannot be found to have instigated an unlawful jurisdictional dispute under § 8(b)(4)(D) for the very same acts. Just as a finding of a valid work preservation motive precludes the conclusion that the union attempted work acquisition, it also compels the finding that there is no legitimate competing claim by a rival group of employees for the preserved work. Additionally, the language of this subsection read literally, is limited to competing claims by employees of the same employer and it is not applicable to the services performed by the workers of those who simply sell merchandise to that employer. Accordingly, plaintiff's claim under

§ 8(b)(4)(D) must also be dismissed. It is not necessary to reach defendant's assertions that no coercion, economic or otherwise, can be found on this record and that the N.L.R.B. must hold a § 10(k) hearing on the alleged § 8(b)(4)(D) violation before the claim is cognizable in a federal court.

Upon the foregoing, it is

ORDERED, that the amended complaint and this civil action are dismissed and the Clerk shall enter judgment for the defendant with costs to be taxed.