629 F.2d 653
 105 L.R.R.M. (BNA) 2104, 89 Lab.Cas. P 12,230,
1980-2 Trade Cases 63,539
 FRITO-LAY, INC., Plaintiff-Appellant,
v.
RETAIL CLERKS UNION LOCAL NO. 7, Chartered by the Retail
Clerks International Association, Defendant-Appellee.
L'EGGS PRODUCTS, INC., Plaintiff-Appellant,
v.
RETAIL CLERKS UNION LOCAL NO. 7, Chartered by the Retail
Clerks International Association, Defendant-Appellee.
 Nos. 78-1724, 79-1111.
 United States Court of Appeals,
Tenth Circuit.
 Argued Jan. 21, 1980.
Decided Aug. 12, 1980.
Rehearing Denied Oct. 15, 1980.
 
 Duane C. Aldrich, Atlanta, Ga. (Mary Louise Westmoreland and R. Slaton Tuggle, III, Atlanta, Ga., and Charles J. Kall, of Holme, Roberts & Owen, Denver, Colo., of counsel, with him, on brief), of Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff-appellant Frito-Lay, Inc.
 Stuart H. Young, Jr. and Stanley E. Tobin, Los Angeles, Cal. (John D. Phillips, Jr. of Yegge, Hall & Evans, Denver, Colo., of counsel, with them on brief), of Hill, Farrer & Burrill, Los Angeles, Cal., for plaintiff-appellant L'Eggs Products, Inc.
 Walter C. Brauer, III and Thomas B. Buescher of Brauer, Simons & Buescher, P. C., Denver, Colo., for defendant-appellee Retail Clerks Union Local No. 7.
 Before SETH, Chief Judge, and LOGAN and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 These cases both deal with the legality of a provision in the collective bargaining agreement between the Retail Clerks Union Local No. 7 (the Clerks) and a multi-employer bargaining group known as the Denver Retail Grocers (the Grocers), and the Clerks' efforts to procure and enforce the provision. The provision prohibits employees of suppliers, including salesmen employed by Frito-Lay, Inc. and L'Eggs Products, Inc., from entering retail grocery stores to stock merchandise. However, employees of bakery and dairy companies, the vast majority of whom were represented by Teamsters, are expressly exempted from the operation of the clause. This exemption was negotiated pursuant to a separate agreement between the Clerks and the Teamsters, whereby the Clerks promised to allow all bakery drivers, dairy drivers and the employees of Morton News to "continue all phases and present activities relative to their jobs." Frito-Lay App. at 20.
 
 
 2
 Frito-Lay and L'Eggs initiated these actions, alleging that the Clerks' agreement with the Grocers violated section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 8(b)(4), 8(e) and 303 of the National Labor Relations Act (N.L.R.A.), 29 U.S.C. §§ 158(b)(4), 158(e), and 187. In No. 78-1724, Frito-Lay, Inc. v. Retail Clerks Union Local No. 7, 452 F.Supp. 1381 (D.C.Colo.1978), the district judge granted the Clerks' motion for summary judgment and dismissed the action. Thereafter, the Clerks moved for summary judgment in No. 79-1111 against L'Eggs, which the district court granted as well. On appeal, L'Eggs and Frito-Lay seek review of the dismissal of these actions. We hold that the summary judgments were improperly granted and reverse for further proceedings consistent with our opinion.
 
 
 3
 Rule 56(c) of the Federal Rules of Civil Procedure states that a motion for summary judgment may only be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Under this standard, we have emphasized that "no margin exists for the disposition of factual issues." Jones v. Nelson, 484 F.2d 1165, 1168 (10th Cir. 1973). "(A)ny relief contemplated by Rule 56, F.R.Civ.P. is drastic and should be applied with caution to the end that litigants will have trial on bona fide factual disputes." Id. Accordingly, in reviewing decisions on summary judgment, "appellate courts must consider factual inferences tending to show triable issues in a light most favorable to the existence of such issues." Redhouse v. Quality Ford Sales, Inc., 511 F.2d 230, 234 (10th Cir. 1975). Viewing the record in the light most favorable to Frito-Lay and L'Eggs reveals the following facts.
 
 
 4
 The Denver Retail Grocers is a multi-employer bargaining unit composed of Safeway Stores, Inc., Albertson's, Inc. and King Sooper, Inc. The Grocers' employees engaged in handling merchandise are represented by the Clerks. The jurisdiction of the Union extends throughout Colorado, and most of the 11,500 members of the Clerks are retail clerks in supermarkets.
 
 
 5
 When the Clerks and the Grocers commenced negotiation of a new collective bargaining agreement in March, 1976, one of the principal demands made by the union was that stocking and shelving work, which was being performed in the stores by salesmen and delivery drivers, be assigned to the Clerks. Evidence was presented below showing that ten or fifteen years earlier the employees of suppliers did not handle the merchandise beyond the back door at all. However, when a number of suppliers began to develop sophisticated merchandising and code dating systems which they trained their own employees to implement in the stores, the Grocers raised no objections.
 
 
 6
 In 1973, the Clerks proposed a clause similar to the provision under consideration here. A contract provision was finally agreed upon which, for the first time, prohibited advance or book salesmen from stocking merchandise in the store. However, it expressly recognized the right of driver salesmen and rack jobbers to order, stock, display and rotate their merchandise.
 
 
 7
 During the 1976 negotiations, the Clerks initially demanded a contract provision that would guarantee to them all in-store marketing work presently done by driver salesmen and rack jobbers. The Grocers rejected that proposal out of hand on the ground that such a provision would create problems with the Teamsters who represented many of the delivery drivers. The Clerks then met with representatives of the Colorado-Wyoming Joint Counsel of Teamsters. In that meeting, the Clerks agreed to alter their demands so that bakery and bread drivers and employees of Morton News Company would be allowed to continue performing stocking work inside the stores. The Grocers quickly assented to the Clerks' modified proposal and agreed to the following contract provision:
 
 
 8
 "Effective July 1, 1976, all rack jobbers and driver salesmen will make their deliveries to the back room at which time it will become bargaining unit work exclusively with the following exceptions:
 
 
 9
 Bread or bakery drivers and dairy drivers shall be allowed to continue as they have in the past.
 
 
 10
 If the Employer violates this Section by using non-bargaining unit people, then the Employer will pay to the most senior part-time clerk an amount equal to the journeyman clerk rate for the time spent by a non-bargaining unit person performing bargaining unit work."
 
 
 11
 Frito-Lay App. at 45.
 
 
 12
 After the clause went into effect, there was considerable dispute as to the reach of the exemptions. The Clerks took the position that drivers for cookie companies, who were not represented by the Teamsters, did not fall within the exemption for bread or bakery drivers. Only after an arbitrator specifically ruled that the exemption covered drivers for cookie companies did the Clerks concede the right of those employees to stock their companies' products.
 
 
 13
 There was also some confusion about whether the employees of Morton News Company, whom the Teamsters did represent, would be allowed to continue to enter the stores as they had in the past. Although the collective bargaining agreement contained no exemption for these employees, the Clerks had assured the Teamsters that the Morton News employees would not be affected by the agreement. Subsequently, the Clerks issued a letter stating that the Teamster-represented Morton News employees could continue to work in the stores as before. The Union later agreed, at the Grocers' request, to exempt all other news distributors from the clause as well.
 
 
 14
 As a result of the clause, the employees of L'Eggs and Frito-Lay were prohibited from performing their usual in-store functions, since they did not fall within the exemptions prompted by the Clerks' contract with the Teamsters.
 
 No. 78-1724:
 
 15
 Frito-Lay is engaged in the manufacture, distribution, and non-retail sale of snack food products throughout the United States. Frito-Lay products are distributed to retail outlets by its route salesmen who are not represented by a labor organization. These salesmen market Frito-Lay products in accordance with a sophisticated merchandising formula designed to maximize sales and assure that the products remain fresh until purchased by customers.
 
 
 16
 In order to implement this system, Frito-Lay has devised an intensive three-week training program which all route salesmen are required to complete before marketing Frito-Lay products. Frito-Lay claims that the Clerks can not learn to implement its merchandising system properly without undergoing such training.
 
 
 17
 The Frito-Lay merchandising system requires the route salesman to perform a number of tasks when he visits a retail outlet, several of which arguably fall outside the range of the Clerks' usual duties. First, the salesman inspects the products on the grocer's shelves, removes the products which are damaged or too old to be of good quality, and rearranges the remaining products so that the oldest products will sell first. Based on his training and experience, the salesman determines how much additional merchandise is needed and prepares an order. When he obtains the merchandise from his truck to fill the order, he shows the merchandise to a receiving clerk who verifies that all of the products on the order have been supplied. The salesman then stocks the merchandise on the shelves in accordance with Frito-Lay's national pattern known as the "space to sales" allocation system.
 
 
 18
 Under this system, space is allocated to various products according to their rate of sale, insuring that fast selling items remain adequately stocked and that slow selling items do not remain on the shelves long enough to become stale. The space allocated to each product is determined store by store based on computer analyses of sales data from each store. The computer analyses are continually updated to keep Frito-Lay sensitive to changing desires of consumers.
 
 
 19
 Frito-Lay contends that as a result of the Clerks' acquisition of the in-store marketing functions formerly performed by its trained route salesmen, it has incurred a dramatic loss in sales and profits. It argues that the Clerks have neither the ability nor inclination to duplicate the marketing work required by Frito-Lay's unique merchandising system, and, as a result, the quality of its products available to the consumer has declined. In addition, separate racks of small snack packs have had to be removed from stores because the Clerks have been unwilling or unable to service the items.
 
 
 20
 In this action, Frito-Lay seeks injunctive relief and damages based upon the alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 8(b)(4) and (e) of the N.L.R.A., 29 U.S.C. §§ 158(b)(4) and 158(e). The amended complaint's first claim for relief alleges that the Clerks entered into a combination, contract or conspiracy with the Teamsters to restrain trade by preventing Frito-Lay and other distributers from servicing their products in violation of section 1 of the Sherman Act, and that the contract provision itself violates section 1 of the Sherman Act and section 8(e) of the N.L.R.A. The second claim for relief alleges that the Clerks' conduct in forcing the Grocers to agree to the provision constituted an unfair labor practice under section 8(b)(4) of the N.L.R.A., for which section 303 provides a damage remedy.
 
 
 21
 The district court rejected these contentions and granted the Clerks' motion for summary judgment. It found as a matter of law that the additional in-store stocking functions acquired by the Clerks as a result of the provision "were the type of jobs which the clerks had traditionally done and for which they had the skills and experience." 452 F.Supp. at 1386 (quoting from Canada Dry Corp. v. N. L. R. B., 421 F.2d 907, 909-10 (6th Cir. 1970)). Accordingly, the court concluded that "the efforts of the union in this case were directed toward work preservation," 452 F.Supp. at 1386, and held that this finding "combined with the conclusion that no secondary employer or dispute is involved, compels dismissal of the claims of violations of §§ 8(e), 8(b)(4)(A) and (B)." Id. The antitrust allegations were also dismissed. The judge held that since the contract provision and the agreement between the Clerks and the Teamsters were sought by the Clerks in order to preserve work for its members in the bargaining unit, they fell within "the recognized national policy of exempting labor organizations from antitrust liability for actions taken to advance legitimate labor objectives." Id. at 1384.
 
 
 22
 On appeal, Frito-Lay urges that the district court, in reaching these conclusions, resolved material issues of fact on a motion for summary judgment contrary to the express language of Rule 56(c) of the Federal Rules of Civil Procedure. We agree.
 
 I.
 Secondary Boycotts and Work Preservation
 
 23
 Section 8(b)(4)(B) of the N.L.R.A. prohibits unions and their agents from engaging in activities the object of which is forcing one employer to "cease using, selling, handling, transporting or otherwise dealing in the products of" another. Similarly, section 8(e) proscribes collective bargaining agreements whereby the employer ceases or agrees to cease "handling, using, selling, transporting or otherwise dealing in any of the products of any other employer . . . ." Section 8(b)(4)(A) prohibits union activities designed to force an employer to enter into an agreement which is prohibited under section 8(e).
 
 
 24
 The Supreme Court has pointed out that a total cessation of business is not required to constitute a violation of these provisions. N.L.R.B. v. Local 825, Operating Engineers (Burns & Roc, Inc.), 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). The Board has specifically held that preventing employees of suppliers from performing stock work inside grocery stores amounts to a cessation of business with the suppliers within the meaning of section 8(e). Retail Clerks Union Local No. 1428, 155 N.L.R.B. 656 (1965). See also Teamsters Local No. 688, 193 N.L.R.B. 701 (1971). However, this finding only marks the beginning of the inquiry into the validity of the contract provision under sections 8(b)(4)(A) and (B) and 8(e).
 
 
 25
 Notwithstanding the sweeping language by which these provisions prohibit activities forcing an employer to cease doing business with another employer, the Supreme Court has made clear that the provisions do not touch union activities engaged in for " 'primary' purposes, including the purpose of preserving for the contracting employees themselves work traditionally done by them." N. L. R. B. v. Enterprise Association of Pipefitters, 429 U.S. 507, 517, 97 S.Ct. 891, 898, 51 L.Ed.2d 1 (1977). Accord, N. L. R. B. v. International Longshoremen's Association, --- U.S. ----, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980). Thus, although the statutory language does not focus solely on secondary activity, these provisions are premised on the distinction between primary and secondary activity and proscribe only the latter. Id. Unfortunately, this distinction "does not present a glaringly bright line." Local 761, International Union of Electrical, Radio & Machine Workers v. N. L. R. B., 366 U.S. 667, 673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961) (Frankfurter, J.).
 
 
 26
 The general purpose of the ban on secondary activity is to protect neutral employers, i. e. those not directly involved in a labor dispute, from direct union sanctions. An agreement by which an employer agrees to preserve work for the contracting employees will inevitably affect other employers (and their employees). However, "(t)he effect of work preservation agreements on the employment opportunities of (others), no matter how severe, is of course irrelevant to the validity of the agreement so long as the union had no forbidden secondary purpose." N. L. R. B. v. International Longshoremen's Association, --- U.S. at ---- n.22, 100 S.Ct. at 2315 n.22. Nonetheless, since such agreements may impermissibly allow a union to use neutral employers as a tool to exert pressure on the employer with whom it has a dispute, the union's motives must be examined with scrutiny.
 
 
 27
 In National Woodwork Manufacturers Association v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Supreme Court set out guidelines for determining whether an agreement constituted a primary work preservation agreement under sections 8(e), 8(b)(4)(A) and 8(b)(4)(B), emphasizing that such a determination requires a very careful examination of the facts:
 
 
 28
 "The determination whether the (agreement) . . . and its enforcement violated § 8(e) and § 8(b)(4)(B) cannot be made without an inquiry into whether, under all the surrounding circumstances,[38] the Union's objective was preservation of work for . . . (the primary employer's) employees, or whether the agreements and boycotts were tactically calculated to satisfy union objectives elsewhere."
 
 
 29
 Id. at 644, 87 S.Ct. at 1268 (emphasis added). See also N. L. R. B. v. International Longshoremen's Association, --- U.S. at ----, 100 S.Ct. at 2313; N. L. R. B. v. Enterprise Association of Pipefitters, 429 U.S. at 510-11, 97 S.Ct. at 894. In National Woodwork, the Court upheld a clause in a labor agreement that prohibited the use of precut doors in order to preserve the work of cutting doors for the unit employees. However, in so holding, the Court suggested a different result would have been reached had the clause been used as a "sword" to reach out and acquire new work rather than as a "shield" to retain work traditionally performed by unit employees at the jobsite. 386 U.S. at 630, 87 S.Ct. at 1260.
 
 
 30
 Subsequent cases have addressed the legality of "work acquisition" clauses whereby work is claimed for unit employees which the employees have never actually performed but which is of the same type as their traditional work. Where the additional work requires the same skills and abilities as the traditional work of the unit employees, the new work has been viewed as "fairly claimable", and the clauses by which such work is acquired have been upheld as primary work preservation agreements. Sheet Metal Workers Local 223 v. N. L. R. B., 498 F.2d 687 (D.C.Cir.1974); Canada Dry Corp. v. N. L. R. B., 421 F.2d 907 (6th Cir. 1970).
 
 
 31
 Here, Frito-Lay contends that the Clerks never stocked and shelved Frito-Lay's products and that they do not possess the requisite skills to perform this task in accordance with its "space to sales" merchandizing system. Frito-Lay argues, therefore, that the work in controversy is not "fairly claimable" by the Clerks and the clause guaranteeing this work to them violates section 8(e). In addition, Frito-Lay maintains that since virtually all of the employees falling within the agreement's exemption for bread, bakery and dairy drivers are Teamsters, the clause unlawfully confers protected status on unionized employees outside the bargaining unit. From this special treatment for the Teamsters, Frito-Lay contends the court should infer an unlawful secondary purpose to organize, or at least assist the Teamsters in organizing, the employees of other suppliers.
 
 
 32
 Upon review of the record, we believe that evidence introduced by Frito-Lay in support of these contentions raises genuine issues of fact that could not be properly disposed of on a motion for summary judgment. Specifically, the evidence creates material factual issues as to whether the work in controversy was of a type traditionally performed by the Clerks, whether the Clerks possessed the skills and abilities to perform the work, and whether the clause in question was designed to influence the employment relations of nonunion suppliers. Nevertheless, the district judge decided these crucial questions of fact in favor of the union, the moving party, although Frito-Lay introduced ample conflicting evidence.[1]
 
 
 33
 Relying heavily on Canada Dry, the district court held that the Clerks possessed the necessary skills and abilities to perform the work of Frito-Lay salesmen. In Canada Dry the court did uphold a clause negotiated by retail clerks which resulted in the clerks' acquisition of shelving work formerly done by employees of suppliers. After a hearing, the Board found that in-store shelving and servicing tasks were performed by the store clerks on the vast majority of grocery merchandise, including goods differing from the products in issue only in brand name. In addition, the Board found that clerks had performed a limited amount of work on the brand name products in question before the effective date of the new contract. Accordingly, the Board upheld the clause as a valid work preservation agreement.
 
 
 34
 The Sixth Circuit affirmed the Board's order, noting that the Board's findings were supported by substantial evidence. The court reasoned that
 
 
 35
 "(a)lthough the tasks of initially handling and shelving the particular brand name products in issue had not been traditionally performed by the store clerks, we do not regard the clerks' claim to these jobs as representing in any realistic sense an attempt to monopolize jobs or acquire new job tasks. Rather, these were the type of jobs which the clerks had traditionally done and for which they had the skills and experience. We agree with the Board's finding . . . that it is unrealistic to define the area of the clerks' legitimate job protection efforts according to brand name or supplier."
 
 
 36
 Id. at 909-10 (emphasis added). However, in Canada Dry, the Sixth Circuit did not hold that all shelving and stocking work within the four walls of the grocery store was "fairly claimable" as a matter of law. A hearing was conducted on the factual issues before it was concluded that the work in controversy was of a type traditionally performed by unit employees and that unit employees had the skills to perform such work.
 
 
 37
 In the instant case, evidence proffered by Frito-Lay shows that its salesmen have received training in specialized marketing techniques such as the computerized "space to sales" allocation of display space; that the actual procedures used by Frito-Lay salesmen, i. e. stocking by individual product units rather than by the case and racking in professionally designed formats, differ from the procedures utilized by the Clerks in stocking other products; that Frito-Lay salesmen, unlike the Clerks, have always exercised complete control over the Grocer's inventory of Frito-Lay products; and that the Clerks have never actually done the work performed by Frito-Lay salesmen. We conclude this evidence is sufficient to raise a genuine issue of fact as to whether the Clerks had the skills and abilities to perform the work in controversy, rendering summary judgment inappropriate.[2]
 
 
 38
 In addition, evidence presented by Frito-Lay was sufficient to create a material issue of fact as to whether the Clerks' objective in securing the clause was to influence the employment relations of other employers. It is well settled that a purported work preservation clause is unlawful if it contains an exemption permitting only those employees outside the bargaining unit who belong to approved unions to continue performing the "preserved" work. N. L. R. B. v. Joint Council of Teamsters No. 38, 338 F.2d 23, 30-31 (9th Cir. 1964); Retail Clerks Union Local 770 (Hughes Markets, Inc.), 218 N.L.R.B. 680 (1975). Such an exemption demonstrates that the clause is not addressed solely to the "labor relations of the contracting employer vis-a-vis his own employees." National Woodwork, 386 U.S. at 645, 87 S.Ct. at 1268.
 
 
 39
 In Retail Clerks Union, Local 770 (The Frito Company), 138 N.L.R.B. 244 (1962), enforcement denied on other grounds, 330 F.2d 458 (9th Cir. 1964), the Board addressed the legality of a work preservation agreement which reserved to the retail clerks all work "in the nature of work generally performed by retail clerks" except "work which is presently under specific contracts with the Teamsters, Culinary Workers, and Building Service Employees Union . . . ." 138 N.L.R.B. at 244-45. In that case, the agreement was applied to allow Teamster-represented driver-salesmen to continue entering into the selling area to service their products, while nonunionized driver-salesmen were forced to surrender such work to the retail clerks. When the clause was challenged under section 8(e), the Board found that the exemption in the agreement for employees outside the bargaining unit who were members of approved unions rendered the clause unlawful under section 8(e):
 
 
 40
 "These Subdivisions (of the contract) constitute an agreement that the Respondent Employers will sub-contract work only to employers who are under contract with the Respondent Unions or with 'Teamsters, Culinary Workers, and Building Service Employees Unions' and accordingly go beyond protecting work of the employees in the unit. The clauses are thus, at least by implication, an agreement not to do business with those who do not so qualify. Accordingly, they are invalid within the meaning of Section 8(e)."
 
 
 41
 138 N.L.R.B. at 247 (emphasis added). And see Canada Dry, 421 F.2d at 910, where the Sixth Circuit's holding was explicitly premised on the absence of any record evidence "that the union would allow the suppliers to shelve their own products provided they were represented by a union approved by the clerks."
 
 
 42
 Here, Frito-Lay has introduced evidence tending to show that the Clerks' motive in exempting bread, bakery and dairy drivers was to confer protected status on the driver-salesmen and rack jobbers represented by the Teamsters. It is undisputed that the exemption was proposed by the Clerks pursuant to a Letter of Understanding entered into by the Clerks and the Teamsters under which the Clerks agreed to permit all bakery drivers, dairy drivers and employees of Morton News[3] to continue making in-store deliveries of their products. Moreover, there is evidence that virtually all of the employees falling into these categories are Teamsters. Indeed when the nonunion cookie drivers continued to stock and shelve their products after the effective date of the Clerks' work clause, the Clerks filed grievances and attempted to enforce the penalty provisions of the agreement for the time the nonunion cookie company employees spent performing in-store servicing functions. They pressed the matter to arbitration, but the Grocers prevailed in their position that these employees are covered by the exemption for bakery drivers.
 
 
 43
 In short, Frito-Lay presented sufficient evidence to create a genuine factual issue as to whether the Clerks' objective was to confer benefits on employees outside the bargaining unit based upon their membership in an approved union. If indeed the Clerks intended to exempt only employees represented by the Teamsters, it may reasonably be inferred that the agreement was addressed not only to Grocers-Clerks labor relations, but to the labor relations of the suppliers vis-a-vis their employees in violation of the Act.[4] On review of a motion for summary judgment, we are compelled to make such inferences in favor of the party opposing the motion.
 
 
 44
 In view of these factual issues, which cannot be resolved summarily, we must remand for trial on the issue of whether the Clerks had an unlawful secondary objective in carving out the exemptions to the contract provisions.
 
 II.
 The Antitrust Exemption
 
 45
 The district court held that both the agreement between the Clerks and the Teamsters and the contract provision in the Clerks-Grocers collective bargaining agreement were exempt from the anti-trust laws. But this holding was expressly premised on its premature finding that the contract provision constituted a valid primary work preservation agreement which advanced legitimate labor objectives. The judge correctly observed that lawful primary activity by unions acting in their own self interests generally may not provide the basis for antitrust liability. See, e. g., United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Granddad Bread, Inc. v. Continental Baking Co., 612 F.2d 1105 (9th Cir. 1979). However, if the judge should determine upon remand that the contract provision was not, in fact, a valid work preservation agreement, possible antitrust liability on the Clerks' part must again be considered.
 
 
 46
 We have reviewed the other contentions made by the parties and find them without merit. We reverse and remand the case to district court for further proceedings consistent with this opinion.
 
 No. 79-1111:
 
 47
 L'Eggs is engaged in the manufacture, distribution and sale of hosiery, panty hose and other retail products, primarily through retail food stores. Like Frito-Lay, L'Eggs has developed a sophisticated merchandising system to which it attributes much of its success in the retail business. L'Eggs' unique system is the product of costly marketing research undertaken in the late 1960's to improve the distribution of hosiery products to food and drug outlets. Essentially, the L'Eggs method was designed to insure that L'Eggs products remain adequately stocked in all colors, styles and sizes and, at the same time, to minimize in-store inventory. In addition, the system provided for an attractive display of the full range of L'Eggs products and served to cut down on pilferage.
 
 
 48
 The system is implemented by L'Eggs' route sales representatives who distribute the products to the retail outlets. Under the L'Eggs method, these representatives follow a multistep procedure on each visit to a grocery store. First, the representative takes an inventory of the remaining products on the L'Eggs display rack and feeds the inventory into a computer which maintains a current history of sales of each item by type, color and size for each individual display. The route sales representative then spray cleans the display rack and the packages, removes the damaged products and rearranges the display so that the products are placed according to style, sizes and color. When this procedure has been completed, the representative returns to the L'Eggs van and selects the products needed to replenish the display to the inventory level determined to be appropriate by computer analysis.
 
 
 49
 L'Eggs contends that its system cannot operate effectively unless L'Eggs' own employees are responsible for the total presentation of the product within the store. Its route sales representatives undergo an extensive training program that includes a number of intensive sessions throughout the first year of employment, which L'Eggs argues is essential to learn the merchandising system.
 
 
 50
 Thus, L'Eggs contends that as a result of the Clerks' acquisition of the in-store marketing functions formerly performed by its trained route sales representatives, its merchandising system has not functioned satisfactorily and L'Eggs has incurred substantial losses in sales and profits.
 
 
 51
 In this action, L'Eggs seeks injunctive relief and damages based upon alleged violations of section 1 of the Sherman Act, 15 U.S.C. § 1, and sections 8(b)(4) and 8(e) of the N.L.R.A., 29 U.S.C. §§ 158(b)(4) and 158(e). The district judge applied the same analysis set forth in Frito-Lay, Inc. v. Retail Clerks Union, Local No. 7, 452 F.Supp. 1381 (D.C.Colo.1978), and granted the Clerks' motion for summary judgment, noting that "(i)n sum, I find no difference between (L'Eggs') panty hose and the potato chips of Frito-Lay." L'Eggs App. at 216.
 
 
 52
 L'Eggs contends that its consignment contract with the Grocers, whereby it retained title over its displays and products until the ultimate sale to the consumer, distinguishes its case from that of Frito-Lay. L'Eggs explains that through this agreement, it retained the right to control the work in controversy. Therefore, L'Eggs argues, "the grocers must be presumed to be a neutral for they could not acquiesce in the Union's demand except by bringing pressure on L'Eggs to cede the work of its employees on its products and its displays to the members of Local 7." L'Eggs Brief at 58.
 
 
 53
 The district court found L'Eggs' argument in this regard without merit, reasoning that:
 
 
 54
 "The consignment agreement is not adequate to give the plaintiff a right of control over the job site . . . (I)t is not the control of an individual product that is significant, what is important is the control of the area in which the labor is performed. Here that control is clearly with Grocers."
 
 
 55
 L'Eggs App. at 216. Although we agree that L'Eggs' consignment agreement does not confer upon L'Eggs the right to control the work in controversy, the district judge's reasoning is somewhat misleading.
 
 
 56
 Under the right of control doctrine, an otherwise valid work preservation clause is illegal if the work sought by the union is work which the employer has agreed, in a contract with a third party, will be performed by other employees. Once the signatory employer loses control over the assignment of such work, it is assumed that union pressure to acquire the work is directed at the third party. See R. Gorman, Basic Text on Labor Law, pp. 269-270. In N.L.R.B. v. Enterprise Association of Pipefitters, 429 U.S. at 523-524, 97 S.Ct. at 900-901 the Supreme Court approved the right to control test, but cautioned that it must not be applied in a mechanical fashion so as to preclude consideration of all of the surrounding circumstances. The Court made clear that the purpose of the right to control test is to determine whose decision the union's efforts are calculated to influence: that of the primary employer or that of a third party. Therefore, the pertinent inquiry is who, under all the circumstances, has the power to assign the work in controversy, not simply who owns the premises where the work is to be performed although that very well might present a relevant circumstance. See N.L.R.B. v. International Longshoremen's Association, --- U.S. at ----, 100 S.Ct. at 2313 (1980), where the Court said:
 
 
 57
 "(T)he contracting employer must have the power to give the employees the work in question the so-called 'right of control' test of Pipefitters, supra. The rationale of the . . . test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work."In the instant case, the consignment agreement provides that: "either party shall have the right to terminate this agreement upon ten (10) days written notice to the other for any reason whatsoever." L'Eggs App. at 189. Thus, although the grocers granted L'Eggs' employees the "right of ingress and egress to stock, service and maintain the displays," id. at 188, they did not surrender power over the assignment of this work in any realistic sense. They simply obligated themselves to provide L'Eggs with written notice before they could reassign the work to other employees. Accordingly, the district court correctly determined that the right to control doctrine is not applicable to distinguish this case from Frito-Lay.
 
 
 58
 For purposes of this appeal, we find this case indistinguishable from Frito-Lay. Here, the district judge resolved the same crucial factual questions under sections 8(b)(4) and 8(e) of the N.L.R.A. on a motion for summary judgment, notwithstanding sharply conflicting evidence on these issues. Accordingly, we remand the case for trial on the issues of (1) whether the work in question is traditional Clerks' work, (2) whether the Clerks possess the necessary skills and abilities to properly perform this work and (3) whether the contract clause was designed to influence the employment relations of other employers. Once again, we note that if the district judge should find the clause unlawful under the secondary boycott provisions, the Clerks' potential liability under the antitrust laws must be considered.
 
 
 59
 We have reviewed the other contentions made by the parties and find them without merit. The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 "[38] As a general proposition, such circumstances might include the remoteness of the threat of displacement by the banned product or services, the history of labor relations between the union and the employers who would be boycotted, and the economic personality of the industry."
 
 
 [1]
 The Clerks are in an odd position to argue that summary judgment was appropriate in this case because two of the issues they framed on appeal admit that the district court made fact findings to support its summary judgment:
 "ISSUES
 "1. . . .
 "2. . . .
 "3. Whether the District Court's factual findings that the disputed work is of the type traditionally performed by members of Local 7 for which they have the necessary skills and experience and that the object of Local 7's contract was work preservation are clearly erroneous and, therefore, whether summary judgment for Local 7 on the alleged violation of § 8(b)(4)(B) was properly granted.
 "4. Whether the District Court's factual finding that Local 7 made no effort to induce or encourage Frito's employees to become members of any labor organization is clearly erroneous and, therefore, whether summary judgment for Local 7 on the alleged violation of § 8(b)(4)(B) was properly granted."
 Clerks' Answer Br. at 1-2 (emphasis added). The district court may not make findings of fact on a motion for summary judgment. Williams v. Eaton, 443 F.2d 422, 433 (10th Cir. 1971).
 
 
 [2]
 The Clerks' reliance on the recent Supreme Court opinion in N. L. R. B. v. International Longshoremen's Association, --- U.S. ----, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), for the proposition that we cannot look to the skills required by Frito-Lay's merchandising system in applying the "fairly claimable" standard is misplaced. In that case, the Longshoremen had previously performed the work in question, i. e. "stuffing and stripping" containers used in shipping freight, and there was absolutely no question that they possessed the requisite skills. In the D. C. Circuit opinion affirmed by the Supreme Court, it was stated:
 "The overriding similarities between the traditional work of longshoremen and the work of stuffing and stripping containers are evident. Longshoremen have historically loaded and unloaded ocean-borne cargo, which not only has meant loading the cargo into and out of the hold of the ship, but also has meant sorting the cargo and loading it, on to equipment such as pallets. From the longshoremen's standpoint, therefore, containerization merely represents a change in equipment."
 International Longshoremen's Association v. N. L. R. B., 613 F.2d 890, 909 (D.C.Cir.1979). See, --- U.S. at ----, 100 S.Ct. at 2309-10. Accordingly, it wasn't necessary for the Court to address the question of whose work must be focused on in applying the "fairly claimable" standard, which is the issue presented in this case. We do not view N. L. R. B. v. International Longshoremen's Association, as precluding further analysis when the work claimed is not work which was previously performed by the union.
 
 
 [3]
 Morton News Company's employees were represented by the Teamsters. Although the agreement did not specifically exempt them from the operation of the Clerks' work clause, the Clerks' initial proposal did. However, the Grocers objected to that proposal on the ground that singling out one company would render the clause illegal
 
 
 [4]
 Even if the Clerks were concerned with the legitimate work preservation interests of bargaining unit employees in securing the provision, the clause would not be ipso facto validated. The Supreme Court has recognized that such clauses are often motivated by both lawful and unlawful interests and has specifically held that the existence of a lawful motive will not immunize an otherwise illegal clause. N. L. R. B. v. Pipefitters, 429 U.S. at 516, 97 S.Ct. at 897