508 F.Supp. 983 (1981)
JADEN ELECTRIC, a Division of the Farfield Company, Plaintiff,
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 211, AFL-CIO, and International Brotherhood of Electrical Workers, Local Union No. 334, AFL-CIO, Defendants.
Civ. A. No. 80-842.
United States District Court, D. New Jersey.
February 27, 1981.
Michael A. Spero, McCarthy & Hicks, Princeton, N. J., and Stephen J. Weglarz, John F. Clough, III, Weglarz, Tryon & Friedman, Lancaster, Pa., for plaintiff.
Robert F. O'Brien, Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N. J., for defendants.
BROTMAN, District Judge.
This action involves a claim for damages pursuant to section 303 of the Labor-Management Relations Act ("Act"), 29 U.S.C. § 187, for defendants' activity allegedly in violation of § 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4). Currently before the court are two motions: one by defendant to dismiss plaintiff's claim on the ground that plaintiff does not have standing, and the other by plaintiff for partial summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, on the issue of liability. Each of these motions presents one issue. The dismissal motion rests on the question of whether a primary employer may bring a cause of action under section 303 of the Act against a labor organization for damages resulting from illegal secondary picketing. The partial summary judgment motion concerns the question of whether the prior Decision and Order of the National Labor Relations Board ("NLRB") that the defendants had violated § 8(b)(4) collaterally estops the defendants from litigating its liability in the present case. Based on the analyses which follow, the defendants' motion is denied and the plaintiff's is granted.
*984 An examination both of the briefs and affidavits filed with respect to these motions and of the findings of fact adopted by the NLRB reveals a general agreement as to many of the relevant facts. The plaintiff, Jaden Electric, a division of the Farfield Company, is a non-union electrical contractor, and defendants, International Brotherhood of Electrical Workers, Local Union Nos. 211 and 334, are unincorporated labor organizations. On March 14, 1979, plaintiff was awarded a contract by the Atlantic County Improvement Authority ("ACIA") to perform electrical construction work at the construction site of the Federal Aviation Administration/National Aviation Facilities Experimental Center ("NAFEC") at Pomona, New Jersey. Unlike plaintiff, many of the other contractors on the project were union employers. In anticipation of some sort of picketing activity, a separate gate, gate 13, was established for the exclusive use of plaintiff and its suppliers while two other gates, gates 18 and 18(a), were reserved for the other building trades. Plaintiff and its suppliers were expressly prohibited from using these two gates, and these prohibitions were followed. On April 12, Local 211 and on April 25, Local 334 picketed gates 18 and 18(a).
On various dates between April 13 and April 27, 1979, plaintiff and ACIA filed unfair labor practice charges before the NLRB alleging that the picketing of Locals 211 and 334 was illegal secondary activity in violation of Section 8(b)(4)(i), (ii)(B) of the NLRA.[1] An Unfair Labor Practice Complaint based upon these charges was issued by the NLRB on May 31, 1979. On July 25 and 26, 1979, a hearing on the merits of this complaint was held before an Administrative Law Judge ("ALJ"). In an October 12, 1979 opinion, the ALJ concluded that Locals 211 and 334 had engaged in illegal secondary activity in violation of Section 8(b)(4)(i), (ii)(B) of the NLRA and he issued an order which included a cease and desist provision.[2] Thereafter, the charging parties (plaintiff and ACIA), the Respondents (Locals 211 and 334), and the General Counsel all filed exceptions to this decision with the NLRB accompanied by supporting briefs. On March 5, 1980, a three member panel of the NLRB specifically affirmed the rulings, findings and conclusions of the ALJ at 248 N.L.R.B. 34. Locals 211 and 334 did not appeal the NLRB's final determination of this issue to the appropriate Circuit Court of Appeals. On March 8, 1980, plaintiff commenced the present action.
Plaintiff asserts jurisdiction under § 303 of the Labor Management Relations Act ("Act"), 29 U.S.C. § 187, which provides:
(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.
(b) Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.
The unfair labor practices charged in the complaint are delineated in § 8(b)(4)(i), (ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(i), (ii)(B).[3] Specifically, the plaintiff claims *985 that unlawful, secondary boycotting or picketing by the defendants resulted in the plaintiff's incurring damages exceeding $50,000.00.

I PLAINTIFF'S STANDING
The defendants assert that the plaintiff does not have standing to sue since § 303 of the Act does not provide a basis for a claim for damages by a primary employer[4] who has been the object of secondary picketing by a labor union. The defendants' major arguments are that the legislative history of the statute, with particular reference to the unfair labor practice provisions, § 158(b)(4), and the logical structure of the statutory framework, supports their position that where primary employers such as the plaintiff may obtain relief through orders handed down by the NLRB and enforceable by the courts, these primary employers lack standing to sue for damages in the Federal Courts. They also contend that this result is particularly appropriate since the secondary boycott provisions of the Act were designed mainly for the protection and benefit of neutral or innocent third parties and not the primary employer.
With respect to the early legislative history of § 8(b)(4), 29 U.S.C. § 158(b)(4), the defendants cite two statements by Senator Taft as summarizing the congressional position as to whom this section was designed to protect. "This provision makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees." 93 Cong.Rec. 4198 (1947). At a later date Senator Taft indicated that, "[t]he secondary boycott ban is merely intended to prevent a union from injuring a third person who is not involved in any way in the dispute or strike...." 95 Cong.Rec. 8709 (1949). The defendants also point out that at the time of the debates over the passage of these sections, much discussion centered around the damages to farmers from secondary boycotts by truckers. As Senator Ball explained, "`[F]arm producers and small businesses and their employees are the main victims of secondary boycotts, jurisdictional strikes, and organizational boycotts.... It is such persons and their rights that we are trying to protect.'" Di Giorgio Fruit Corp. v. National Labor Relations Board, 191 F.2d 642, 644 (D.C.Cir.), cert. denied, 342 U.S. 869, 72 S.Ct. 110, 96 L.Ed. 653 (1951).
The defendants conclude that the clear implication of statements such as those by Senators Taft and Ball is that it is the neutral party who is to be protected from secondary boycotts or picketing. This position has received other support: "The general purpose of the ban on secondary activity is to protect neutral employers, i. e., those not directly involved in a labor dispute, from direct union sanctions." Frito-Lay, Inc. v. Retail Clerks Union Local No. 7, 629 F.2d 653 (10th Cir. 1980). See 2 U.S. Code Congressional and Administrative News 2382 (1959).
The defendants draw a further inference from the congressional purpose for stopping secondary activity. They assert that since the protection of neutral parties who are unconnected with the primary dispute but are caught in the crossfire is a major reason for banning secondary activity, then only *986 neutral parties and not primary employers should be allowed to maintain an action for damages under § 303(b) of the Act, 29 U.S.C. § 187(b). The defendants do not contend that a primary employer should be without relief from union unfair labor practices. Rather, they argue, a primary employer claiming unfair labor practices should look for relief to the orders of the NLRB, as enforceable by the Court of Appeals (under 29 U.S.C. § 160(f) et seq.), and such relief does not include a claim for damages by a primary employer.
In an effort to further support their attempt to limit a primary employer's relief to that provided by the NLRB, the defendants develop a cursory argument, based on legislative history from 1947, that the primary responsibility for policing such unfair labor practices as secondary boycotts was to remain with the NLRB; therefore, the union or employer involved in the dispute should not be allowed to bring suit for damages. As a supplement to this argument, the defendants point to the policy statement in 29 U.S.C. § 151 which states: "It is declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce...." Since the defendants complied with both the injunction temporarily restraining their picketing and the subsequent cease and desist order adopted by the NLRB at 248 NLRB 34, the plaintiff has already received such relief as is consistent with this policy.[5] Thus, the defendants finally conclude that the history and structure of § 303 mandates that the term "whoever" should not be construed literally and that the plaintiff as a primary employer should not be allowed to obtain damages. The defendants express a deep concern that a literal interpretation of the statute would allow anyone alleging a harm, however remote, arising from the secondary activities of a union to bring suit. As a result, numerous unnecessary and vexatious claims would be brought against the unions, and the national policy of encouraging industrial peace would be undermined.
After assessing the defendants' various arguments and the available, albeit limited, case law, we cannot agree with the defendants' ultimate conclusions that the plaintiff does not have standing. Rather, we have decided that the provision, "Whoever shall be injured in his business or property by reason of any violation of subsection (a) of this section may sue therefor in any district court of the United States...," § 303(b) of the Act, 29 U.S.C. § 187(b), allows a primary employer to sue for damages allegedly caused by a secondary boycott.
Although the legislative history of § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4), which the defendants present does demonstrate a strong congressional desire to protect neutrals from secondary boycotts and secondary picketing, it does not necessarily follow that the "whoever" of § 303(b) must be limited to such neutral parties. In the first place, language in the legislative history of § 303 itself suggests that a broader view than that proposed by the defendants of the term "whoever" was intended. For example, the Conference Committee report indicated that:
Section 303 of the Senate amendment contained a provision the effect of which was to give persons injured by boycotts and jurisdictional disputes described in the new section 8(b)(4) of the National Labor Relations Act a right to sue the labor organization responsible therefor in any district court of the United States... to recover damages sustained by him together with the costs of the suit. A comparable provision was contained in the House bill in the new section 12 of the National Labor Relations Act dealing with unlawful concerted activities. The conference agreement adopts the provisions of the Senate amendment with clarifying changes.
U.S.Code Congressional Service, 1147 (1947).
*987 In the second place, and more importantly, the inferences drawn by the defendants confuse a reason for banning secondary activity with the actual goal of preventing such behavior by labor organizations. We view § 303 not only as a method of compensation, but, more significantly, as a device which acts in conjunction with NLRB relief to form a dual remedial scheme which aims to facilitate the policy of deterring the unfair labor practices encompassed in § 8(b)(4). See generally Consolidated Express v. New York Shipping Ass'n., 602 F.2d 494, 508-09 (3rd Cir. 1979). A broader construction of "whoever" enhances the deterrence capacity of the damage provision. In this regard, allowing a primary employer to maintain an action for damages is particularly appropriate and should have a greater impact on a union tempted to violate § 8(b)(4) than a potential suit by a neutral party could have. The probability is greater that a primary employer will actually bring suit and that the resulting money judgment will be higher. Faced with this prospect, a union will be less likely to engage in secondary boycotts or secondary picketing. The result should be less unlawful secondary activity and, thus, more protection for innocent neutrals against their being unfairly harmed by such activity.
By granting plaintiff, a primary employer, standing and by adopting a broadened interpretation of the language of § 303(b), we do not intend to imply, as the defendants assert, that unions must then be subjected to damage claims from anyone alleging a harm, however remote, arising from the secondary activities of a union. The constraint on such potentially, burdensome litigation stems from the requirement that a plaintiff attempting to establish a damage claim under § 303 must prove more than incidental or remote damages. As one court has explained, "[r]ecovery under § 303 is limited to actual, compensatory, damages, Local 20, Teamsters Union v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280... (1964), and the damages must be both nonspeculative and proximately caused by Union wrongdoing. Federal Prescription Service, Inc. v. Amalgamated Meatcutters, 527 F.2d 269 (8th Cir. 1976)." Pickens-Bond Construction v. United Brotherhood of Carpenters, 586 F.2d 1234, 1242 (8th Cir. 1978). The necessity of a plaintiff's satisfying these requirements should prevent a court from applying the phrase "Whoever shall be injured" literally and without any limits. Contra, United Brick & Clay Workers v. Deena Artware, 198 F.2d 637, 644 (6th Cir. 1952) (Dicta).
Our decision to grant standing to the plaintiff also receives support from the case law. Although the number of cases specifically addressing the issue of a primary employer's standing to maintain a § 303 suit is limited, the available cases do lend support to our result, although not necessarily to our reasoning. The leading case on this issue is United Brick & Clay Workers v. Deena Artware, 198 F.2d 637 (6th Cir.), cert. denied, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694 (1952), where the court allowed a § 303 action by a primary employer against a union for illegal secondary picketing. In the process of making its decision, the court interpreted the phrase "Whoever shall be injured" in a highly literal fashion. The court based its extremely expansive view on its conclusion that:
If Congress considered the use of the secondary boycott in a labor dispute as unfair labor practice and illegal, as it did by the enactment of the Labor-Management Relations Act of 1947, it was entirely consistent with such decision to give a right of action to anyone who was injured in his business by a violation of the law thereafter.
198 F.2d at 644. As noted earlier, we do not agree with applying such an overly broad interpretation to all situations; however, we do concur in the result granting standing to the primary employer.
The Deena Artware decision has been followed in other Sixth Circuit cases, see, e. g., United Mine Workers v. Osborne Mining Company, 279 F.2d 716, 719-27 (6th Cir. 1960) (affirming an award of damages to the primary employer), and has been cited with approval in W.J. Milner & Co. of Florida v. IBEW, Local 349, 476 F.2d 8, 10 (5th *988 Cir. 1973) (addressing the right to sue of third parties who are neither the neutral nor primary objects of secondary boycott activity). Finally, the Supreme Court's handling of Local 20, Teamsters, Chauffeurs & Helpers v. Morton, 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964) provides a further reason for our holding in the present case. In Morton, a case involving a primary employer's § 303 suit, the Court affirmed the district court's award of compensatory damages. Even if, as the defendants assert, the issue of standing was not briefed and the court affirmed without discussing the question, we do not believe that these factors warrant our disregarding the Morton case, particularly in light of our earlier discussions addressing the legislative history and purpose of the statute.

II COLLATERAL ESTOPPEL
Since we have granted the plaintiff standing, we next can address the plaintiff's motion for partial summary judgment on the issue of liability. The plaintiff argues that the determination by the NLRB that the two local unions, the defendants herein, committed unfair labor practices within the meaning of § 8(b)(4)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(B), collaterally estops the defendants from litigating its liability for damages in the present § 303, 29 U.S.C. § 187, suit. As noted earlier, § 303(a) of the Act, 29 U.S.C. § 187(a), requires a determination of whether the union committed an unfair labor practice within the meaning of § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4).
The applicability of collateral estoppel to the present type of situation has been addressed by many courts. In this Circuit, the court in Consolidated Express v. New York Shipping Ass'n., 602 F.2d 494 (3rd Cir. 1979) indicated:
Since Utah Construction [384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966)] courts in several circuits have held that prior NLRB unfair labor practice determinations were controlling on the issue of liability, as to both facts and law, in a subsequent § 303(b) damage action. E. g., International Wire v. Local 38, IBEW, 475 F.2d 1078 (6th Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973) (res judicata against charging party); Texaco, Inc. v. Operative Plasterers & Cement Masons, 472 F.2d 594 (5th Cir.), cert. denied, 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973) (res judicata against charged party); Painters District Council 38 v. Edgewood Contracting Co., 416 F.2d 1081 (5th Cir. 1969); Eazor Express, Inc. v. General Teamsters Local 326, 388 F.Supp. 1264, 1266-67 (D.Del. 1975). [See also Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150, etc., 436 F.2d 1064 (9th Cir. 1971).] These holdings are undoubtedly sound. The NLRB has been designated by Congress as the tribunal of choice for the adjudication of unfair labor practices, and the doctrine of primary jurisdiction is a judicial recognition of the importance of that designation. See, e. g., Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 684-85, 85 S.Ct. 1596, 1599-1600, 14 L.Ed.2d 640 (1965).
602 F.2d, at 503.
In deciding whether to give collateral estoppel effect to the NLRB's decision, it is necessary to examine the administrative proceedings to determine if "the parties... had an adequate opportunity to litigate," United States v. Utah Construction & Mining Co., 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 155 (1966), the unfair labor practice issue. See also, e. g., Paramount Transport Systems v. Chauffeurs, Teamsters & Helpers, Local 150, etc., 436 F.2d 1064, 1066 (9th Cir. 1971); Eazor Express, Inc. v. General Teamsters Local 326, 388 F.Supp. 1264, 1267 (D.Del.1975). After evaluating the proceedings in the present case, we are satisfied that the defendants had a full and fair opportunity to litigate the issues throughout every stage of the NLRB process. The ALJ conducted two full days of hearings on the merits of the unfair labor complaint. Both Jaden Electric [the present plaintiff] and Locals 211 and 334 [the present defendants] appeared at the administrative hearing and were represented by counsel. Counsel for all parties *989 (which included the NLRB and ACIA as well as the other three) had the opportunity for direct and cross-examination of all witnesses and to present any evidence on their behalf. Counsel for the local unions examined witnesses, presented exhibits and also presented a closing argument. In addition, subsequent to the hearing, counsel for all parties submitted briefs to the ALJ. After the ALJ issued his findings, the parties filed exceptions which were reviewed by the NLRB before affirming the decision of the ALJ. It should also be noted that the ALJ's decision was quite thorough and was supported by substantial evidence. Finally, although the unions could have obtained a direct review under § 10(f), 29 U.S.C. § 160(f), in the Court of Appeals, they chose not to avail themselves of that procedure.
The defendants have argued that collateral estoppel should not be applied since, as they have alleged in their Answer, the plaintiff was not licensed to perform work in the state of New Jersey, and this lack of license, if proven, would be an affirmative defense to the § 303(b) claim. The defendants also claim that proof of the plaintiff's being unlicensed would also bear on the fairness of plaintiff's presence at the construction site.
The defendants' argument cannot be accepted. In Consolidated Express, supra, the court was faced with a similar situation and held "the absence of an ICC license would [not] be a defense to liability under § 303(b) for the unfair labor practices found by the NLRB." 602 F.2d at 509. Thus, we have decided to apply collateral estoppel in this case and to grant the plaintiff's motion for partial summary judgment on the issue of liability.
An appropriate order will be entered.
NOTES
[1] The complaint also charged that Local 211 had engaged in and was continuing to engage in unfair labor practices within the meaning of Section 8(b)(7)(C). On May 15, 1979, United States District Court Judge John F. Gerry issued a temporary injunction restraining Local 211 from picketing plaintiff at the NAFEC site in Peter W. Hirsch, etc. v. International Brotherhood of Electrical Workers, Local Union No. 211, Civil No. 79-1488 (D.N.J.).
[2] Local 211 additionally was found to have violated § 8(b)(7) of the NLRA.
[3] Section 8(b)(4)(i), (ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(i), (ii)(B) provides that:

(b) It shall be an unfair labor practice for a labor organization or its agents 
. . . .
(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is 
. . . .
(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
[4] There is no dispute that the plaintiff is the primary employer in this labor dispute.
[5] The defendants' argument has been set out here only in brief since the court does not believe an extended recitation is necessary in light of our following analysis.